BARKER *v.* VALENTINE.

COMMON-LAW MARRIAGE — IMPEDIMENT — EVIDENCE TO REBUT PRESUMPTION—PROCEEDS OF BENEFIT CERTIFICATE.

.Where it appeared that the beneficiary named in an insurance certificate as the wife of the insured was at the time living with him as his wife, being held out, treated, and introduced by him as such, and that she continued so to live with him until his death, four years later, any presumption as to the continuance of an alleged illicit relationship between the parties, claimed to be shown to have existed prior to the death of a former wife, which occurred three years before the certificate issued, was overcome, and the beneficiary named was entitled, as being in any event the common-law wife of the insured, to the proceeds of the certificate.[1]

Appeal from Wayne; Frazer, J. Submitted October 12, 1900. Decided December 4, 1900.

Bill by Mary H. Barker to restrain the Great Camp of the Knights of the Maccabees for Michigan from paying to Margaret I. Valentine certain death benefits under a certificate issued to George A. Valentine, deceased. From a decree dismissing the bill, complainant appeals. Affirmed.

*Edward S. Grece* (*William B. Jackson*, of counsel), for complainant.

*Phillips & Jenks*, for defendant Valentine.

*De Vere Hall*, for defendant Great Camp of Knights of Maccabees.

MOORE, J. April 20, 1892, George A. Valentine, a resident of Detroit, made a written application for mem-

---

[1] On the question of cohabitation as proof of marriage where it begins unlawfully, see *Collins* v. *Voorhees*, ( N. J.) 14 L. R. A. 364, and note.

bership in the Great Camp of the Knights of the Macca-
bees.   In that application, among others, the following
questions were asked and answered:

"*Q.* Are you married ?
"*A.* Yes.   *   *   *
"*Q.* The name and relation of the party or parties for
whose benefit your certificate is to be applied ?
"*A.* Margaret I. Valentine, wife."

He declared that the above were fair and true answers
to the questions.   The Margaret I. Valentine mentioned in
the application is the same person who is a defendant in
this case.

A certificate was issued in which it was stated that, if
the certificate was in force at the time of the death of Mr.
Valentine, upon satisfactory proof of his death "his bene-
ficiary, to wit, Margaret I. Valentine, his wife, will be
entitled to receive one assessment on the membership, but
not to exceed two thousand dollars."   Mr. Valentine died
December 3, 1896.   Due proofs of his death were furnished
the great camp.

After the proofs had been filed, a protest was filed with
said order by the complainant, Mary H. Barker, who is a
sister of Mr. Valentine, against the payment to the said
Margaret I. Valentine of the amount of such certificate,
on the ground that the said Margaret was not the wife of
the said George A. Valentine.   After the filing of the
said protest, notice was given by said order to both said
Margaret and the said Mary H. Barker, or their attorneys,
and the matter was referred to the executive committee of
the great camp; and said committee, acting under and in
accordance with its laws, appointed a time and place for
the hearing of the respective claims of the said Margaret
and the said Mary H. Barker.   Several adjournments
were had, and finally the matter was heard before said
committee, a large amount of proofs being filed before
them; and the said committee, acting without fraud and
in good faith, decided that, under the proofs, the payment
of the amount of said certificate should be made to the

said Margaret I. Valentine. An appeal was taken, as provided by the laws of said order, by Mary H. Barker to the Great Camp of the Knights of the Maccabees for the State of Michigan. This appeal was heard before the committee on appeals and grievances, on the testimony presented before the executive committee, and also on additional testimony presented to them. At the hearing before the executive committee, and at the hearing before the committee on appeals and grievances, both parties were represented by counsel; and, after a full hearing, the last-named committee decided in favor of Margaret I. Valentine, and recommended to the great camp that the amount of the certificate be paid to her. The report was adopted by the great camp, then in session, after a hearing before the great camp, in which the complainant was represented by counsel, and by the action of the great camp its officers were instructed to pay the amount of such certificate to the said Margaret I. Valentine. Thereupon, and before the payment of the amount of such certificate, the complainant filed the bill in this case to restrain the organization from paying the money to the said Margaret, and to require the payment of the same to the said Mary H. Barker. After a full hearing the court dismissed the bill of complaint, and the case is brought here by appeal.

The questions presented to the court are:

*First.* Was the beneficiary named in the certificate the wife of George A. Valentine?

*Second.* Under the laws of the order, have these parties a right to appeal to the courts, or is the action of the order final?

*Third.* In any event, can the complainant be entitled to the fund in question?

As we think the answer to the first question is decisive, we shall not discuss the others.

The facts are not in dispute. So far as material, they are as follows: In 1872 Mr. Valentine was married to Ida Barron in the State of New York. Differences arose

between them, and Mr. Valentine instituted divorce pro-
ceedings against his wife.    An order was made requiring
him to pay alimony and solicitor's fees.   He did not com-
ply with this order, and it does not appear that anything
further was done in that proceeding.    In 1884 Mr. Valen-
tine came to Detroit, Ida Valentine remaining in the State
of New York.    Margaret Desbrough was a resident of
Detroit.    In 1881 she filed a bill of complaint for divorce
against her husband, Henry Desbrough, which resulted in
the court granting her a decree of divorce.    The decree
was not entered in the records at that time, though Mrs.
Desbrough did not know of that fact until after the death
of George Valentine, when the court made an order direct-
ing the decree to be entered *nunc pro tunc.*    It is claimed
in the brief of counsel that in May, 1885, a marriage cere-
mony was performed at Detroit between George A. Valen-
tine and Margaret Desbrough.    Upon the trial of this case
the fact was not proven, but it was proven that he intro-
duced Mrs. Desbrough as his wife, and stated they had been
married, and they lived and cohabited together as husband
and wife.    Some time after this occurred, Mr. Valentine
and Margaret Valentine returned to Mr. Valentine's former
home, in New York; and in September, 1889, Ida Valen-
tine made a complaint against Mr. Valentine as a disorderly
person, for failing to support her, and a warrant was issued.
The docket of the police court showed that Mr. Valentine
pleaded "Not guilty," and that on the adjourned day the
parties failed to appear.    Mr. Valentine claimed to his
acquaintances in New York that he had then been
divorced from the first wife, but there is nothing in the
record to show that he had in fact been divorced.    In
October, 1889, Ida Valentine died.    The record does not
disclose just when Mr. Valentine returned to Detroit, but
he had been living there some time when he made appli-
cation for membership in the defendant order, with Mar-
garet Valentine; he introducing her as his wife, and she
introducing him as her husband, and they living together
as husband and wife.    Shortly after this Mr. and Mrs.

Valentine moved to Cleveland, and rented a house of Mr. Case, in which they lived for more than six years, and until the time of his death. The testimony is overwhelming that in Cleveland they lived together as husband and wife. Mrs. Valentine was a member of a church belonging to one of the leading denominations. They introduced each other as husband and wife. They lived in a respectable neighborhood, were visited by respectable people, and in turn visited respectable people. The complainant in this case lived with them for a time, and also corresponded with them, as did other relatives of Mr. Valentine, and treated the defendant as the wife of George Valentine. It is now said by counsel that they did this because they supposed that George Valentine had been divorced from his first wife when he married the defendant. There is nothing to show that Mrs. Valentine knew there was any impediment to her marriage with Mr. Valentine until after his death.

It is the claim of complainant that, as Mr. Valentine had a lawful wife living when he married the defendant, their relations were illicit, and, when this illicit relation once exists, it is presumed to continue, and subsequent actual marriage will not be presumed from continued cohabitation and reputation after the legal impediment to enter into such a contract is removed; citing *Rose* v. *Rose*, 67 Mich. 619 (35 N. W. 802); *Van Dusan* v. *Van Dusan*, 97 Mich. 70 (56 N. W. 234). An examination of *Rose* v. *Rose* shows that the question arose between the parties to the alleged marriage contract; the one claiming that there was an agreement to marry, and the other denying it. In disposing of the case the court said that the testimony had been carefully reviewed, and failed to satisfy the court that any marriage was ever agreed upon. The court used the following language:

"The complainant's bill, and her testimony relied upon to support it, present a sad exhibition of the indecencies and immoralities of these parties, and the continuance of which, through almost an entire generation, unpunished,

is now sought by the complainant to be made the basis of the most sacred of all contracts known to the law. A court of equity will never set its seal of confirmation to such baseness and immorality."

The case of *Van Dusan* v. *Van Dusan* was also a case where one of the parties alleged that the marriage relation never existed. In disposing of the case, Justice Hooker said:

"The evidence does not satisfy us that these parties ever availed themselves of the opportunity, offered them after the divorce was obtained, of changing their relation. Doubtless the complainant was willing, and we could wish that defendant had been honorable enough to grant her request; but it is not within our province to make a contract of marriage on account of commiseration for one or contempt for the other party, when the evidence does not show one to exist. We think the case within the principle of *Rose* v. *Rose*, 67 Mich. 619 (35 N. W. 802). We are therefore not disposed to disturb the decree of the circuit judge, who saw the witnesses, and, in our judgment, committed no error in dismissing the bill."

There is nothing in either of these cases to indicate that if, after the impediment to a lawful marriage between them had ceased, they had intended to take each other as husband and wife, and had indicated that intention by treating each other in all respects as though they were married, and had introduced each other as husband and wife, and had so held themselves out to the world, and had lived together as husband and wife, the court would not have held that the presumption that the illicit relation, which existed when they commenced to live with each other, continued after the impediment to their marriage ceased, was overcome.

In the case of *Blanchard* v. *Lambert*, 43 Iowa, 228 (22 Am. Rep. 245), the plaintiff married Mr. Blanchard when she had a former husband, Mr. Musgrave, living. Musgrave died in June, 1871. The plaintiff and Mr. Blanchard continued to live together as husband and wife until his death, in August, 1872. Mr. Blanchard introduced her

as his wife. He made a will in which he mentioned her as his wife. They lived happily, and in his last illness, which lasted about 10 months, Mrs. Blanchard waited upon him, and treated him in all respects as a lady would treat her husband. She was recognized in the community as the wife of Mr. Blanchard, and was treated with respect. The court said:

"Under these circumstances, even if the marriage were originally void, a subsequent marriage will be presumed to have occurred after the removal of all legal impediments by the death of Musgrave, in June, 1871."

1 Bish. Mar., Div. & Sep. §§ 970, 975, state the rule as follows:

"Sec. 970. If the parties desire marriage, and do what they can to render their union matrimonial, yet one of them is under a disability, as where there is a prior marriage undissolved, their cohabitation, thus matrimonially meant, will, in matter of law, make them husband and wife from the moment when the disability is removed; and it is immaterial whether they knew of its existence or its removal, or not, nor is this a question of evidence. This doctrine is overlooked in some of the cases, but it is abundantly sustained by others, and the reasoning on which it rests is conclusive. Here are the mutual present consent, to which not even written or spoken words are necessary, and consummation, which is useful in the proofs, but is not necessary,—more, therefore, than the law requires."

"Sec. 975. Though a cohabitation was introduced by a formal ceremony of marriage, and the parties erroneously supposed the impediment of a former marriage to have been taken away, and never had their mistake corrected, still, in localities where formal solemnization is not essential, valid marriage may be presumed to have occurred after the impediment was removed. To employ words more nicely accurate, and cover a larger ground, the living together of marriageable parties a single day as married, they meaning marriage, and the law requiring only mutual consent, makes them husband and wife; for here are all the elements of a contract of present matrimony."

In section 979 the author gives instances:

" Where a woman had formally married, believing her husband to be dead, and, on his returning, still continued to cohabit under the second marriage, and kept it up for several years after he really died, a second marriage after such death was presumed. And in another case, where a married man, knowing his wife to be alive, entered into a form of marriage with another woman, who did not know of the impediment, and continued the cohabitation under this second marriage until after the death of the first wife, a marriage after such death was inferred."

See, also, *Fenton* v. *Reed*, 4 Johns. 52 (4 Am. Dec. 244); *Hynes* v. *McDermott*, 91 N. Y. 451 (43 Am. Rep. 677); *U. S.* v. *Hays*, 20 Fed. 710; *White* v. *White*, 82 Cal. 427 (23 Pac. 276, 7 L. R. A. 799); *Yates* v. *Houston*, 3 Tex. 433; *North* v. *North*, 1 Barb. Ch. 241 (43 Am. Dec. 778).

The legal impediment to a marriage between these parties, if it had not been removed before, was removed by the death of Ida Valentine in October, 1889. The parties after that date resided and cohabited together. Mr. Valentine applied for insurance, in which he declared he was married, and named his beneficiary, Margaret I. Valentine, his wife. They were regarded and treated by their relatives and neighbors as husband and wife. Mr. Valentine was a carpenter by trade. He was ill for a long time before his death. The testimony is that Mrs. Valentine treated him kindly, gave him his medicine, and did all those things a wife would be expected to do for her husband. She took in boarders, and applied the proceeds to his support as well as her own. No question was raised after the death of Ida Valentine but that Margaret Valentine and George Valentine were husband and wife, until his death, seven years after the legal impediment to their marriage had ceased to exist. Under such circumstances, their marriage must be presumed. *Hutchins* v. *Kimmell*, 31 Mich. 126 (18 Am. Rep. 164); *Peet* v. *Peet*, 52 Mich. 464 (18 N. W. 220); *Flanagan* v. *Flanagan*, 116 Mich. 185 (74 N. W. 460); *People* v. *Mendenhall*,

119 Mich. 404 (78 N. W. 325, 75 Am. St. Rep. 408);
*Lorimer* v. *Lorimer*, 124 Mich. 631 (83 N. W. 609).

The decree is affirmed, with costs.

The other Justices concurred.