---

(123 App. Div. 79.)

### In re WELLS' ESTATE.

(Supreme Court, Appellate Division, Fourth Department. January 8, 1908.)

1. MARRIAGE—NATURE OF OBLIGATION.

A common-law marriage is defined as any mutual agreement between the parties to be husband and wife in præsenti, especially where it is followed by cohabitation, if there is no legal disability on the part of either to contract matrimony.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, §§ 4, 13, 16.

For other definitions, see Words and Phrases, vol. 2, p. 1332.]

2. SAME.

Decedent; having a wife in an insane asylum, married appellant, who entered into the contract in good faith, fully believing that she became decedent's lawful wife. Thereafter the first wife died in the asylum. For a number of years subsequent thereto and until his death decedent and appellant, although no further ceremony was had, lived together as husband and wife, were held out to be such by each other, and were so recognized by the friends and relatives of both. Appellant never knew of such first wife's existence until shortly before decedent's death, and it does not appear that decedent knew when his first wife died. *Held*, that upon the death of his first wife, appellant became decedent's wife, and is entitled as his widow to administer the estate.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Marriage, § 16.]

Robson, J., dissents.

Appeal from Surrogate's Court, Niagara County.

Proceeding by Ella Ryckert to revoke letters of administration granted to Emma Wells upon the estate of Arthur Wells, deceased. From a decree revoking the letters of administration, Emma Wells appeals. Reversed.

This proceeding was commenced by the filing of the petition of Ella Ryckert, the respondent, with the Surrogate's Court, verified on the 9th day of Novem-

ber, 1906, which alleged that she was the sister of Arthur Wells, deceased, and his only heir at law, and was entitled to letters of administration upon his estate; that Emma Wells, the appellant herein, and to whom letters of administration had theretofore been issued, was not the widow of the said Arthur Wells, deceased, and was therefore not entitled to such letters. Thereupon, and on the 12th day of November, 1906, a citation was issued by the Surrogate's Court, directing the appellant, Emma Wells, to show cause on the 26th day of November, 1906, why a decree should not be made revoking the letters of administration theretofore granted to her. Upon the return of such citation the parties appeared, either in person or by counsel, a trial of the issues was had, and at the close of the entire evidence the decree which is appealed from was made and entered, upon the ground that the appellant is not the widow of the said Arthur Wells, deceased, and therefore is not entitled to administer his estate. The facts bearing upon that issue are not in dispute; and the only question presented by this appeal is whether or not the appellant, Emma Wells, is such widow.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Frank F. Williams, for appellant.
Robert H. Gittins, for respondent.

McLENNAN, P. J. On the 18th day of September, 1889, a ceremony of marriage between the decedent, Arthur Wells, and the appellant, Emma Wells, whose maiden name was Emma Garrett, was performed at the city of Chicago, Ill., by the Reverend A. K. Parker, pastor of the Centennial Baptist Church of said city, in the presence of witnesses, and in all respects in conformity with the laws of said state. A certificate of such marriage signed by the clergyman and by two witnesses was put in evidence in this proceeding, and its genuineness is not questioned. Neither is it suggested that the appellant did not consent to the performance of such ceremonial marriage in perfect good faith, fully believing it valid in all respects, and that she thereby became the lawful wife of Arthur Wells. Immediately upon the performance of such marriage Emma Wells commenced to live and cohabit with Arthur Wells as his wife, and they sustained to each other the relation of husband and wife until his death, which occurred on the 24th day of May, 1905. During all that time the appellant was called and known as Mrs. Arthur Wells. They lived in the city of Chicago for nearly two years after such marriage. They then moved to the state of Nebraska, where they resided for about three years, when they returned to the state of Illinois, where they remained until about February, 1895, when they went to St. Paul, Minn., where they resided until 1903, when they again returned to Chicago, where they resided until the death of Arthur Wells. It is thus seen that for more than 15 years the appellant lived with and cohabited with Arthur Wells as his wife, and there can be no question but that she understood and believed that the relation which she sustained to him during all that time was that of wife. During those years the decedent's sister, Ella Ryckert, the respondent, frequently visited at the home of these people, as did also the father and mother of Arthur Wells. In fact, his mother lived in the home for a considerable time, died there, and Emma Wells, this appellant, and other members of the family, went with the body of the mother to the city of Niagara Falls, where she was

buried. During all that time the respondent, the father and mother and other members of the decedent's family, as well as all others who came in contact with them, treated and recognized the appellant as his wife. She was called "daughter" by the father and mother, "sister" by the respondent, and, as above stated, "Mrs. Arthur Wells" by all. It appears, however, that at the time the appellant married Arthur Wells he had a lawful wife living; that such wife had become insane, and that he had placed her in an asylum near the city of Chicago; and that such wife lived about five years after the decedent's marriage to the appellant. The appellant did not know of such former marriage or when the death of such former wife occurred. She had never heard of her existence until shortly prior to the death of Arthur Wells. Neither does it appear expressly that the decedent ever knew of the death of his former wife; but it does appear without contradiction that such former wife, in fact, died within five years after the ceremonial marriage was performed between Arthur Wells and the appellant, and, as we have seen, after the death of such former wife, Arthur Wells and the appellant continued to live and cohabit as man and wife, and continued to be recognized as such by the members of his family and by all others with whom they associated. During all those years the appellant discharged all the obligations imposed upon her by such relation. She took care of her husband during sickness, kept house for and made a home for him. Upon these facts the question arises: Is the appellant the widow of Arthur Wells and entitled to administer his estate?

Concededly the ceremonial marriage was void because at that time Arthur Wells had a lawful wife living, and no rights in favor of the appellant can be predicated upon it. After such impediment ceased to exist by the death of the former wife, did a common-law marriage take place between Arthur Wells and the appellant? In each of the states in which the parties resided a common-law marriage is recognized, and, if established, is as effective and valid for all purposes as is a ceremonial marriage. Does the evidence contained in the record in this case establish a common-law marriage between the appellant, Emma Wells, and the decedent, Arthur Wells, after the death of his former wife, and such as to constitute them husband and wife from that date? We think the question involved has been decided by the courts of this and of the other states in which the parties resided in accordance with the appellant's contention. A common-law marriage is defined as any mutual agreement between the parties to be husband and wife in præsenti, especially where it is followed by cohabitation, if there is no legal disability on the part of either to contract matrimony. 2 Kent's Comm. 87; Rose v. Clark, 8 Paige, 574, 580. In that case the decision of the court is very clearly and concisely expressed in the headnote, as follows:

"Any mutual agreement between a man and woman to be husband and wife in præsenti, especially if followed by cohabitation, constitutes a valid and binding marriage, where there is no legal disability on the part of either to contract matrimony. An actual marriage may be presumed from matrimonial cohabitation, and the acknowledgment of the parties that they are husband and wife. And, even where such matrimonial cohabitation commenced between the parties under a contract of marriage which was void, a subsequent mar-

riage after the removal of the disability may be presumed from acts of recognition by the parties of each other as husband and wife, and from continued matrimonial cohabitation, and general reputation.  But the mere fact that a man and woman live together, and carry on an illicit intercourse, is not sufficient to raise a presumption that they are married.  Such presumption only arises from matrimonial cohabitation, where the parties not only live together as husband and wife, but also hold themselves out to the world as sustaining that honorable relation to each other."

No language could be employed which, as it seems to me, could be more applicable to the facts in the case at bar.  The impediment on the part of Arthur Wells, which prevented him from entering into the marriage state with the appellant, was removed, and after its removal the parties lived together for a dozen years or more as husband and wife. They were held out to be such by each other, and were so recognized by the friends and relatives of both.  In the case of Fenton v. Reed, 4 Johns. 52, 4 Am. Dec. 244, in the statement of facts it is said:

"The only point in controversy was whether the plaintiff was the widow of Reed.  In the year 1785 she was the lawful wife of John Guest.  Some time in that year Guest left the state for foreign parts, and continued absent until some time in the year 1792, and it was reported, and generally believed, that he had died in foreign parts.  The plaintiff in 1792 married Reed.  In that year, and subsequent to the marriage, Guest returned to this state, and continued to reside therein until June, 1800, when he died.  *  *  *  After the death of Guest, the plaintiff continued to cohabit with Reed until his death in September, 1806, and sustained a good reputation in society; but no solemnization of marriage was proved to have taken place between the plaintiff and Reed subsequent to the death of Guest."

It was held that upon the death of Guest a common-law marriage was established between the parties.  The court in its opinion said:

"The marriage of the plaintiff below with William Reed during the lifetime of her husband, John Guest, was null and void.  It was of no legal avail whatever, and not sufficient to constitute them husband and wife de facto.  *  *  * Elizabeth Reed was, then, the lawful wife of John Guest, and continued so, until his death in 1800; and the true question is whether there was evidence sufficient to justify the court below in concluding that she was afterwards married to Reed.  *  *  *  It is stated that there was not proof of any subsequent marriage in fact, and that no solemnization of marriage was shown to have taken place.  But proof of an actual marriage was not necessary.  Such strict proof is only required in prosecutions for bigamy, and in actions for criminal conversation.  4 Burr. 2057; Doug. 171.  A marriage may be proved, in other cases, from cohabitation, reputation, acknowledgment of the parties, reception in the family, and other circumstances from which a marriage may be inferred.  4 Burr. 2057; 1 Esp. Cases, 213; 2 Bl. Rep. 877; Peake's Cases, N. P. 231.  No formal solemnization of marriage was requisite.  A contract of marriage made per verba de præsenti amounts to an actual marriage, and is as valid as if made in facie ecclesiæ."

In the case at bar it is positively shown that no ceremonial marriage did take place between the parties subsequent to the death of the former wife of Arthur Wells; but we think it conclusively shows that a common-law marriage did take place immediately upon the removal of the impediment which prevented the parties from entering into the marriage state.  In the case of Rose v. Clark, supra, Chancellor Walworth uses this language (page 582 of 8 Paige):

"After all that transpired previous to the death of the intestate [in this case Arthur Wells], I think he would have been precluded from denying that she (the appellant) was his wife.  *  *  *  And, if the evidence was sufficient to

raise the presumption of a legal marriage as to him, in his lifetime, it must necessarily be sufficient to entitle her representative to the widow's portion of the estate, under the statute of distributions."

It is hardly conceivable that in the case at bar Arthur Wells, if living, would be heard to deny that the appellant was his lawful wife. Expression was given to the same principle in the case of Townsend v. Van Buskirk, 33 Misc. Rep. 287, 68 N. Y. Supp. 512, in an opinion written by Justice Maddox. The justice said (page 290 of 33 Misc. Rep., page 514 of 68 N. Y. Supp.):

"There is to my mind a well-defined distinction between illicit relations, forbidden because of an undisclosed disability on the part of one of the parties thereto, and such relations as are mutually meretricious, involving on the part of the woman knowledge that its character is not, and is not intended to be, matrimonial, but of a wanton and lustful nature. * * * Page 291 of 33 Misc. Rep., page 514 of 68 N. Y. Supp. There can be no other conclusion from all the evidence in the case than that she and Townsend desired marriage, that that was their intention, and consequently 'their cohabitation, thus matrimonially meant,' made 'them husband and wife from the moment when the disability' on his part was removed, and it was immaterial whether he knew of that removal, * * * the fact being that it was removed, and their consent to the matrimonial relation may be inferred from their acts and conduct."

See, also, Maynard v. Hill, 125 U. S. 190, 8 Sup. Ct. 723, 31 L. Ed. 654, where marriage is defined to be "something more than a mere contract, though founded upon the agreement of the parties. When once formed, a relation is created between the parties which they cannot change, and the rights and obligations of which depend, not upon their agreement, but upon the law, statutory or common."

In the case of Eaton v. Eaton, 66 Neb. 676, 92 N. W. 995, 60 L. R. A. 605, the same question was considered, and the court said (page 683 of 66 Neb., page 998 of 92 N. W., 60 L. R. A. 605):

"Another question to be determined is the legal effect of the cohabitation of the parties after the impediment to their marriage had been removed. In this state the only thing essential to a marriage is the consent of parties capable of contracting. * * * If the parties live together and intend to sustain toward each other the relation of husband and wife, they are, in the absence of any impediment fatal to that relationship, legally married."

See, also, State v. Worthingham, 23 Minn. 528.

The position taken upon this question by the Illinois courts is illustrated in the cases of Cartwright et al. v. McGown, 121 Ill. 388, 12 N. E. 737, 2 Am. St. Rep. 105; Robinson v. Ruprecht, 191 Ill. 424, 61 N. E. 631; Manning v. Spurck, 199 Ill. 447, 65 N. E. 342. See, also, Stein v. Stein, 66 Ill. App. 526.

Many other decisions rendered by the highest courts of other states might be cited to like effect. It seems to me, in view of the decisions and authorities which have been referred to, that the rule ought to be that where one person is free to enter into the matrimonial relation and does so in good faith, but the other party is incapable of entering into such relation because of a former wife or husband living, or other impediment, when such impediment is removed, if the parties continue matrimonial cohabitation, continue to introduce and recognize each other as husband and wife, and are so recognized by their relatives, friends, and by society, it ought to be held that from such moment they are actually husband and wife, and that under such

circumstances it is of no importance that a formal agreement to live together as husband and wife was not entered into, or that either did not know that the impediment to such an agreement had been removed, when, in fact, it had been so removed, and both parties were competent to enter into the matrimonial state; that under the laws of this state and of every other state in which Arthur Wells and Emma Wells resided a common-law marriage took place when the former wife of Arthur Wells died and they proclaimed themselves to the world, as they did day by day, to be man and wife, held themselves out as such, were recognized as such, not only by relatives and friends, but by all the world as well; that such holding out and recognition by them constituted an absolute agreement that they were thus man and wife, and that they had consented and agreed to live in such relation; that Arthur Wells, if living, would not have been heard to deny such relation; that the respondent, the heirs or next of kin of the deceased, are not in position to deny under the circumstances that they were husband and wife.

It follows that the decree of the Surrogate's Court appealed from should be reversed, with costs to the appellant.

Decree of Surrogate's Court reversed, with costs to appellant. All concur, except ROBSON, J., who dissents.