*In re* FITZGIBBONS' ESTATE.

MARRIAGE—HUSBAND AND WIFE—COMMON LAW RELATION—RE-
  MOVAL OF DISQUALIFICATION OF HUSBAND—GOOD FAITH.
    A bigamous marriage, entered into by the wife in good faith
    and by the husband with knowledge that he had a living
    wife in another State, becomes valid after the removal of his
    disqualification by the death of the first wife, and continued
    cohabitation by the living parties, although the wife never
    learned of the existence or death of the prior wife and the
    husband was ignorant of her decease. BROOKE, OSTRANDER,
    HOOKER, and MCALVAY, JJ., dissenting.

Error to Ionia; Davis, J. Submitted February 17,
1910. (Docket No. 81.) Reargued July 1, 1910. De-
cided July 14, 1910. Rehearing denied December 8, 1910.

Sarah Jane Fitzgibbons petitioned for her appointment
as administratrix of the estate of William Fitzgibbons, de-
ceased, claiming to be his widow, and was appointed by an
order of the probate court. Later, William Fitzgibbons,
Jr., filed a petition asking for her removal and denying the
validity of the marriage. Said later petition was granted,
the administratrix was removed and the heirs determined,
and she appealed to the circuit court. A judgment sus-
taining the validity of the marriage is reviewed by Wil-
liam Fitzgibbons, Jr., and other heirs on writ of error.
Affirmed by a divided court.

*A. A. & H. A. Ellis,* for appellants.

*R. A. Hawley,* for appellee.

BROOKE, J. The writ of error in this case is prosecuted
by certain heirs of William Fitzgibbons, deceased, for the
purpose of reviewing a judgment of the circuit court, by
which it was determined that Sarah Jane Fitzgibbons is

the lawful widow of deceased, and, as such, entitled to participate in his estate.

Certain facts appear in the record, about which there is no dispute. William Fitzgibbons, deceased, was married to Armenia Allen, at New Haven, Oswego county, New York, in the year 1868. After the marriage, he and his wife lived at North Volney, New York, until 1876, during which time, two children, Grace and William, Jr., were born to them. The family then removed to Galt, Canada, where a third child, Ella, was born. When the youngest child, Ella, was about two years old, in 1878, deceased sent his wife, Armenia, and the three children, back to New York State, and himself came to Michigan. From 1878 to June 20, 1881, deceased was in correspondence with his wife, Armenia. In 1880, he had settled in Saranac, Ionia county, this State, and there boarded with a family named Stewart. Deceased shortly began paying court to a daughter, Sarah Jane (appellee), who was then about 19 years of age. On February 14, 1881, he took her to Grand Rapids and there went through a marriage ceremony with her, after which they returned to Saranac and commenced to live together as husband and wife. Their home remained in Saranac during the balance of his life, though he was absent at times on business. Appellee bore to deceased one child, a daughter, Madeline, born February 6, 1891. From 1881 to 1900 deceased had no correspondence with his family in New York, so far as the record discloses. In the latter year, his son, William, went to Saranac and discovered himself to his father. Deceased took his son to his home for dinner and supper and held a long conference with him, in which he told his son that he was in Armenia's power, that he did not want to be punished for bigamy, and that when he, the son, needed help, to let him know. Thereafter, and up to the month of his death (November 13, 1904), he paid various small sums to his son, which were devoted to the care of Armenia, who died September 3, 1903. It is apparent that deceased was not aware of the death of his wife, be-

cause he sent his son $20 but a few days before his own death. During the 23 years appellee and deceased lived in Saranac, they were reputed to be husband and wife; they received and were received socially, moving among the best people of the vicinity. Deceased seems to have acquired the respect and confidence of the community, holding the office of postmaster at Saranac for seven or eight years preceding his death.

Prior to her marriage with deceased, appellee heard that deceased was a married man. Upon inquiry, deceased denied the fact of his prior marriage. Again, in 1891, shortly after the birth of the daughter, appellee was told by Mary Fitzgibbons, a sister-in-law of deceased, of the former marriage, and that there were three children. Appellee then made further inquiry of deceased, whereupon, she testifies, he admitted his former marriage, but claimed to have a divorce. She makes the claim that she implicitly relied upon the statements made to her by deceased, both before the marriage ceremony and later, when she taxed him with his bad faith. She states that in spite of the rumors which reached her ears she went through the entire 23 years of her association with deceased in absolute ignorance of the existence of his wife, and in good faith believing herself to be his lawful wife. She swears that she had no knowledge of the death of Armenia, in 1903, because she never knew of Armenia's existence, and that after Armenia's death no new contract was made between herself and her husband, their relations continuing after that event (of which deceased also was ignorant) in reliance upon the ceremonial marriage, contracted in 1881.

Under the facts above disclosed, the court submitted to the jury the question of whether or not appellee was the legal widow of deceased, making the determination of the jury, upon that point, rest solely upon the good faith of appellee in entering into the contract and in continuing to live with deceased thereunder, up to the time of his death, using the following language:

"It is a question of belief. She must have been informed to that degree the burden is upon her to establish she was acting in good faith after the other side have once established there was a former wife living at the time of the marriage. Then the burden shifts to Jennie and it is incumbent upon her to show by a preponderance of evidence she acted in good faith; that is, she believed William Fitzgibbons was her lawful husband and there was no impediment to the marriage between her and William Fitzgibbons, if she honestly believed that, taking into consideration all that was said and told her in the discussion she had with her husband, if she was convinced from what he said, and other sources, these rumors were false and untrue and she was laboring under the honest belief that she was his lawful wife, that she had the legal right to marry him and he to marry her at the time it was done, she would be considered innocent, and the law would consider her the legal wife and widow of the deceased because of the inference that they had a common-law marriage after the death of the first wife, provided she was innocent all the way along."

The legitimacy of Madeline was made to depend upon the finding of the jury as to her mother's legal status. The jury, apparently with much difficulty, found that appellee was the legal widow of deceased and that Madeline was his legitimate daughter.

Section 8589, 3 Comp. Laws, provides:

"Marriage, so far as its validity in law is concerned, is a civil contract, to which the consent of parties capable in law of contracting, is essential."

Section 8616 provides:

" All marriages which are prohibited by law, on account of consanguinity or affinity between the parties, or on account of either of them having a former wife or husband then living, * * * shall, if solemnized within this State, be absolutely void. without any decree of divorce or other legal process."

It being conceded upon this record that the marriage between deceased and Armenia Allen, in 1868, was a valid union and that Armenia was alive and undivorced in 1881, when the contract between deceased and appellee was en-

tered into, it is clear that the later marriage was absolutely void, and, during the life of Armenia, afforded no protection to appellee. At no time prior to Armenia's death was deceased legally competent to give his assent to a union with appellee. His relations with appellee during those 22 years were meretricious and known to him to be such, for on June 20, 1881, four months after the ceremony was performed between him and appellee, he wrote his wife, Armenia, acknowledging the receipt of a letter from her, and promising to return to her as soon as possible. On September 3, 1903, Armenia died. Then, for the first time, it became possible for deceased and appellee to intermarry. Did they in fact do so?

It is apparent from the record that during the last year of the life of deceased (following the death of his wife) he treated appellee in all overt respects as a husband should treat his wife. He addressed numerous letters to her as his wife, and subscribed them as her husband, and during that year he lived at their home with her for several months, during which time the relations of husband and wife seem to have been sustained, so far as was apparent to the world. His conduct, however, during this period was not different in any respect from his conduct during the preceding 22 years, when he knew his relations with her were adulterous. Under these circumstances, it is claimed by the appellee, and, in effect, so charged by the court, that, assuming the good faith of the appellee in entering into the void contract and continuing to live under it, a marriage should be presumed as soon as the impediment was removed. These facts and circumstances, if uncontradicted and unexplained, might support the inference that a new and valid contract was entered into upon the death of Armenia, but such inference is impossible, if negatived by positive evidence.

Schouler's Domestic Relations (5th Ed.), § 15, defines marriage as follows:

"To constitute a perfect union, the contracting parties should be two persons of the opposite sexes, without dis-

qualification of blood or condition, both mentally competent and physically fit to discharge the duties of the relation, neither of them being bound by a previous nuptial tie, neither of them withholding a free assent."

And further, at section 26:

"A union once originating between man and woman, purely illicit in its character, and voluntarily so, there must appear some formal and explicit agreement between the parties thereto, or a marriage ceremony, or some open or visible change in their habits and relations, pointing to honest intentions, before their alliance can be regarded as converted into either a formal or an informal marriage. Nor is the issue between informal marriage and illicit intercourse to be concluded by the conduct of the pair towards society. They may, for convenience or decency's sake, hold themselves out to third persons as man and wife, while yet sustaining at law, and intentionally, a purely meretricious relation."

Eversley on Domestic Relations, p. 2, says:

"Marriage is a state or relation depending for its existence upon the fact of parties competent to contract the relation, and their *legally voluntary present* consent to do so."

At page 7, he says further:

"The presumption of marriage, arising from cohabitation and repute, can only be rebutted by clear and satisfactory evidence. * * * But this presumption of law in favor of marriage does not hold good under all circumstances."

In 1 Bishop on Marriage, Divorce & Separation, § 344, it is said:

"Where all the facts are covered by direct proofs, and there is no room to presume others, they will be held to constitute marriage only when they disclose a concurring consent to it, by the two minds at the same instant."

Particular stress is laid by counsel for appellee upon some language contained in the opinion of this court, in the case of *Barker* v. *Valentine,* 125 Mich. 336 (84 N. W. 297, 51 L. R. A. 787, 84 Am. St. Rep. 578), but we

believe that a careful reading of the case will disclose that it is not out of harmony with the earlier decisions of the court. In that case, Valentine had started divorce proceedings against his first wife, Ida, in New York. No divorce was granted. He removed to Michigan and entered into relations with the second woman, Margaret. After four years, he and Margaret, in September, 1889, returned to New York where Ida caused a warrant to be issued against him for nonsupport. Ida died in October, 1889, a fact apparently known to both Valentine and Margaret. They returned to Detroit where he made application in a fraternal order for insurance, describing Margaret as his wife. He introduced her as his wife, lived with her as such, and she was so recognized by his friends and relatives for seven years.

We understand that the court held in this case simply that the evidence disclosed by the record was sufficient to support an inference that the parties had entered into a new contract, after the removal of the impediment. For, in discussing the cases of *Rose* v. *Rose*, 67 Mich. 619 (35 N. W. 802), and *Van Dusan* v. *Van Dusan*, 97 Mich. 70 (56 N. W. 234), the court said:

"There is nothing in either of these cases to indicate that if, after the impediment to a lawful marriage between them had ceased, they had intended to take each other as husband and wife, and had indicated that intention by treating each other in all respects as though they were married, and had introduced each other as husband and wife, and had so held themselves out to the world, and had lived together as husband and wife, the court would not have held that the presumption that the illicit relation, which existed when they commenced to live with each other, continued after the impediment to their marriage ceased, was overcome."

An examination of the authorities cited in this case, both from Michigan and other States, shows that in each case the question as to whether or not a common-law marriage existed was determined upon the evidence.

A careful examination of all the cases in Michigan leads us to the conclusion that a contract of marriage can-

not be presumed when such presumption would do violence to the facts in the case, fully covered by the proofs. *Hutchins* v. *Kimmell*, 31 Mich. 126 (18 Am. Rep. 164); *Peet* v. *Peet*, 52 Mich. 464 (18 N. W. 220); *Rose* v. *Rose, supra; Williams* v. *Kilburn*, 88 Mich. 279 (50 N. W. 293); *Van Dusan* v. *Van Dusan, supra; Flanagan* v. *Flanagan*, 116 Mich. 185 (74 N. W. 460); *Lorimer* v. *Lorimer*, 124 Mich. 631 (83 N. W. 609); *Judson* v. *Judson*, 147 Mich. 518 (111 N. W. 78).

The question in the case at bar appears to us to be: Did deceased and appellee, at any time subsequent to the removal of the impediment, presently agree to take each other for husband and wife, and live together in that relation? Clearly they did not. He did not, because he died in the belief that his wife, Armenia, was still alive. Her assent to the new contract, if it could be assumed, and it is negatived by her own testimony, would avail nothing, for both must consent at the same time, else no contract follows. To predicate the legal status of the appellee upon her good faith alone is not only contrary to authority, but would result, possibly, in the absurdity of a man leaving two or more legal widows.

If deceased, in the case at bar, had entered into a contract of marriage with a woman in South Carolina, the State in which he was doing business at the time of his death, that woman, entering into the relation in good faith, would also have become his wife upon the removal of the impediment, and would now also be his legal widow. We are aware that the principle contended for by appellee has received recognition to some extent in some other jurisdictions, notably in a late case in New York (*In re Wells' Estate*, 123 App. Div. 79 (108 N. Y. Supp. 164), 194 N. Y. 548 [87 N. E. 1129]), but we are satisfied that no such doctrine has been or should be incorporated into the law of this State.

The judgment should be reversed.

OSTRANDER, HOOKER, and McALVAY, JJ., concurred with BROOKE, J.

MOORE, J.   I cannot agree with the conclusion reached by Justice BROOKE.   The record shows that Mrs. Fitzgibbons entered upon and continued her relations with William Fitzgibbons and bore a child to him in full belief that she was lawfully wedded to him, and without knowledge that there was any legal impediment to their entering into the marriage.   The record is equally clear that after the impediment to their marriage was removed Mr. Fitzgibbons held Mrs. Fitzgibbons out to the world as being his wife.   After that event he addressed her as his wife in at least 50 letters and signed himself as her husband.   Under conditions like these it must be said that the authorities are not agreed.   The precise question has not been presented and passed upon by this court. There is an interesting discussion of the issue of marriage or no marriage in the case of *Bechtel* v. *Barton*, 147 Mich. 318 (110 N. W. 935).   The nearest case in point to the one before us is *Barker* v. *Valentine*, 125 Mich. 336 (84 N. W. 297, 51 L. R. A. 787, 84 Am. St. Rep. 578), in which language is used in the opinion which the trial judge thought justified him in giving the charge he did.   It may be true that the language used in the opinion was not necessary to the disposition of the case, but it was fully justified by the authorities cited on pages 342 and 343 of the opinion.

Is it necessary, in the interest of public policy, that when women enter into the marriage relation and continue it in the full belief that they are lawfully wedded wives, and bear children to their husbands in the full belief that those children have a right to bear his name, and the relation continues after the legal impediment is removed, the woman all the time believing she is a lawful wife, and the man holding her out as such, that she should be characterized as though she was a harlot, and had knowingly entered into meretricious relations?   Can it be urged as in furtherance of good morals that children born under such circumstances may be truthfully characterized as

illegitimates? An affirmative answer to these questions shocks one's sense of justice.

This view has been taken by very respectable courts. The case of *In re Wells' Estate*, 123 App. Div. 79 (108 N. Y. 164), is directly in point. In the opinion occurs the following:

"In the case of *Rose* v. *Clark*, 8 Paige (N. Y.), 582, Chancellor Walworth uses this language:

" 'After all that had transpired previous to the death of the intestate (in this case Arthur Wells), I think he would have been precluded from denying that she (the appellant) was his wife. * * * And if the evidence was sufficient to raise the presumption of a legal marriage as to him, in his lifetime, it must necessarily be sufficient to entitle her representative to the widow's portion of the estate, under the statute of distributions.'

"It is hardly conceivable that in the case at bar Arthur Wells, if living, would be heard to deny that the appellant was his lawful wife. Expression was given to the same principle in the case of *Townsend* v. *Van Buskirk*, 33 Misc. Rep. 287 (68 N. Y. Supp. 512), in an opinion written by Mr. Justice Maddox. The justice said:

" 'There is to my mind a well-defined distinction between illicit relations, forbidden because of an undisclosed disability on the part of one of the parties thereto, and such relations as are mutually meretricious, involving on the part of the woman knowledge that its character is not, and is not intended to be, matrimonial, but of a wanton and lustful nature. * * *

" 'There can be no other conclusion, from all the evidence in the case, that she and Townsend desired marriage, that that was their intention, and consequently "their cohabitation, thus matrimonially meant," made "them husband and wife from the moment when the disability" on his part was removed, and it was immaterial whether he knew of that removal, * * * the fact being that it was removed, and their consent to the matrimonial relation may be inferred from their acts and conduct.'

"See, also, *Maynard* v. *Hill*, 125 U. S. 190 (8 Sup. Ct. 723), where marriage is defined to be—

" 'Something more than a mere contract, though founded upon the agreement of the parties. When once formed, a relation is created between the parties which they cannot change, and the rights and obligations of which depend, not upon their agreement, but upon the law, statutory or common.'

"In the case of *Eaton* v. *Eaton*, 66 Neb. 676 (92 N. W. 995, 60 L. R. A. 605), the same question was considered, and the court said:

" 'Another question to be determined is the legal effect of the cohabitation of the parties after the impediment to their marriage had been removed. In this State the only thing essential to a marriage is the consent of parties capable of contracting. * * * If the parties live together and intend to sustain toward each other the relation of husband and wife, they are, in the absence of any impediment fatal to that relationship, legally married.'

"See, also, *State* v. *Worthingham*, 23 Minn. 528.

"The position taken upon this question by the Illinois courts is illustrated in the cases of *Cartwright* v. *Mc-Gown*, 121 Ill. 388 (12 N. E. 737, 2 Am. St. Rep. 105); *Robinson* v. *Ruprecht*, 191 Ill. 424 (61 N. E. 631); *Manning* v. *Spruck*, 199 Ill. 447 (65 N. E. 342). See, also, *Stein* v. *Stein*, 66 Ill. App. 526.

"Many other decisions rendered by the highest courts of other States might be cited to like effect. It seems to me, in view of the decisions and authorities which have been referred to, that the rule ought to be that where one person is free to enter into the matrimonial relation and does so in good faith, but the other party is incapable of entering into such relation because of a former wife or husband living, or other impediment, when such impediment is removed, if the parties continue matrimonial cohabitation, continue to introduce and recognize each other as husband and wife, and are so recognized by their relatives, friends, and by society, it ought to be held that from such moment they are actually husband and wife, and that under such circumstances it is of no importance that a formal agreement to live together as husband and wife was not entered into, or that either did not know that the impediment to such an agreement had been removed, when, in fact, it had been so removed, and both parties were competent to enter into the matrimonial state."

In *Eaton* v. *Eaton*, *supra*, it appeared that the parties were married March 21, 1899; that plaintiff, Harriet M. Eaton, obtained a decree of divorce from Enis Goff in Johnson county, December 2, 1898; that said decree of divorce was obtained without the knowledge of Eli Eaton; that the parties to this suit lived together until November 30, 1899; that the decree of divorce from Enis Goff, the

former husband of plaintiff, was obtained less than six months prior to the marriage of plaintiff and defendant; that such marriage was in violation of law and a nullity; and that defendant had no knowledge of the time when the prior divorce was procured until just prior to the commencement of this action. The marriage between plaintiff and defendant was adjudged to be null and void.

In reversing this decree the court used the following language:

" Another question to be determined is the legal effect of the cohabitation of the parties after the impediment to their marriage had been removed. In this State the only thing essential to a marriage is the consent of parties capable of contracting. *Bailey* v. *State*, 36 Neb. 808 (55 N. W. 241); *Gibson* v. *Gibson*, 24 Neb. 394 (39 N. W. 450). Even a license is not indispensable. *Haggin* v. *Haggin*, 35 Neb. 375 (53 N. W. 209). If the parties live together and intend to sustain toward each other the relation of husband and wife, they are, in the absence of any impediment fatal to that relationship, legally married. The marriage between the plaintiff and defendant was an attempt made in good faith to form a legal union. Both intended to live in wedlock. In the absence of an impediment to the marriage no ceremony would have been required; the mutual consent of the parties would have been sufficient. When the impediment was removed, why may not consent be inferred from continued cohabitation? This exact question arose in the House of Lords in the case of *De Thoren* v. *Attorney General*, reported in L. R. 1 App. Cas. 686, decided in 1876. The question turned upon the legitimacy of certain children born to a man and woman who were married in Scotland, going through a public ceremony in a church, believing the marriage a valid one. The man, however, had been divorced, and the time for appeal from the decree at *nisi prius* had not expired at the time of the public marriage. In that case the contention was that the inference of marriage was rebutted, because the parties had commenced living together in pursuance of an invalid marriage, and that the consent deducible from cohabitation must be referred to the ineffectual ceremony. But it was there decided that—

" 'It must be inferred that the matrimonial consent was inter-

changed as soon as the parties were enabled, by the removal of the impediment, to enter into the contract.'

"And further:

"'The ceremony which took place, although invalid, was undoubtedly a consent by the parties to live together as husband and wife. And their subsequent cohabitation was proof of continued consent.'

"In the case cited, Lord Chelmsford said:

"'Taking the facts as they are stated in the case, and applying the law to them, the court of session is of opinion that, assuming the ignorance of the parties of the invalidity of the ceremony of marriage. during the whole period of their cohabitation, yet after the removal of the impediment to their marriage and before the birth of their eldest son, they became married persons. I agree entirely with this opinion.'

"In *Rose* v. *Clark*, 8 Paige (N. Y.), 574, Chancellor Walworth says:

"'It appears, however, from decisions in our own courts, as well as in England, that a subsequent marriage may be inferred from acts of recognition, continued matrimonial cohabitation, and general reputation, even where the parties originally came together under a void contract of marriage'

"*Fenton* v. *Reed*, 4 Johns. (N. Y.) 52 (4 Am. Dec. 244); *Blanchard* v. *Lambert*, 43 Iowa, 228 (22 Am. Rep. 245). In the recent case of *University of Michigan* v. *McGuckin*, 62 Neb. 489 (87 N. W. 180, 57 L. R. A. 917), it was held, although the relations of the parties were originally meretricious, that marriage is a social status, the existence of which may be shown by conduct clearly indicating free consent and mutual intention to live in wedlock. Upon the conceded facts in this case, our conclusion is that the parties, by continuing to live together in the matrimonial relation, contracted a valid marriage."

In the case of *Robinson* v. *Ruprecht*, Curtis E. Robinson and Johannah Schoeninger began living together without pretense of marriage. In April, 1873, they went before a justice of the peace, where a marriage ceremony was performed. Previous to this ceremony both parties had been married. The woman supposed her first hus-

band was dead, though he in fact was still living. Mr. Robinson had a prior wife living from whom he had not been divorced, as he well knew. The parties continued to live together as husband and wife until the death of Johannah, which occurred in April, 1891. The undivorced wife of Mr. Robinson died in December, 1875. Gottlieb Schoeninger, husband of said Johannah, died in May, 1890. There is nothing to indicate that knowledge of his death came to either of the parties. In disposing of the case the court used the following language:

"The formal statutory celebration of marriage between said Curtis E., Sr., and said Johannah, indicated that it was their desire their subsequent connection should be considered and understood to be matrimonial. They in good faith, so far as this record discloses, at the time of the marriage, believed that Johannah was a widow and might lawfully marry, but Curtis E., Sr., at least, knew that he then had a living wife and could not lawfully enter into another marriage union. In 1875, about two years after their formal marriage, Mary J., the wife of said Curtis E., Sr., died, and within a few months thereafter said Curtis E., Sr., and Johannah, were advised that said Mary J. was no longer living. They then believed there was no impediment to their legal union as husband and wife. There is no direct proof they subsequently entered into a statutory marriage, but their actions, conduct, their cohabitation and repute, were foreign to and inconsistent with any relation other than that of husband and wife, and there can be no doubt but that after the death of said Mary J. the cohabitation between said Curtis E., Sr., and said Johannah, was matrimonial in the intent and belief of both of them. Their actions, life, and repute from henceforth during the remainder of their lives were those of husband and wife. The impediment to that legal relation was removed May 13, 1890, by the death of said Gottlieb, the husband of said Johannah. There is no proof on the question whether they were or were not advised of his death. They believed that he was dead when the ceremony of marriage was performed in McHenry county, in 1873, and so far as the record discloses were never advised to the contrary. Johannah lived nearly a year after the death of Gottlieb and died April 14, 1891, and said Curtis E., Sr., survived Johannah but

about one year.    It was lawful after the death of Gottlieb for them to enter into the marriage relation.    They believed their cohabitation was matrimonial, intended it should be so, and the presumption of marriage from cohabitation apparently matrimonial became applicable to their relation as husband and wife in aid of the legitimacy of their children.    *   *   *    The acts of each toward the other were those of husband and wife, and to said Martha J., Curtis E., Jr., and Bessie L., their children, who were members of the family, they deported themselves as father and mother.    Their whole life was inconsistent with any other relation than that of husband and wife.    A few months after the death of said Gottlieb Schoeninger, they, with the appellee children, visited the relatives of the husband in Massachusetts.    Curtis E., Sr., introduced Johannah to his kindred as his wife and the appellee children as their children.    He manifested parental pride in the children, was anxious the appellee daughters should exhibit their proficiency in music to his kindred, and declared his satisfaction that through appellee Curtis E., Jr., his name would be perpetuated.    A family reunion was held at the house of his brother, Nathan S., at which Curtis E., Sr., Johannah, and the appellee children attended as a family.    *   *   *    A pew was rented in the South Park Avenue Church, and Curtis E., Sr., and Johannah attended services together there.    Deeds were executed conveying to them property as husband and wife, naming them as such, and they uniformly treated and called each other husband and wife.    Curtis E., Sr., applied for letters of administration on the estate of Johannah, declaring under oath therein that he was her widower.    He received an engrossed copy of resolutions passed by a lodge of which he was a member, extending sympathy and condolence on the death of his wife, and he brought such copy home to the children.    He directed her name, as Johannah Robinson, to be engraved upon the plate of her coffin, and an inscription to be engraved on her monument in which she was declared to be his wife, and caused to be published an obituary notice of her death, naming her as 'Johannah, beloved wife of C. E. Robinson.'    A common-law marriage was thus established, and such marriages are valid in this State.    *Port v. Port*, 70 Ill. 484; *Elzas v. Elzas*, 171 Ill. 632 (49 N. E. 717).''

What was done in the case just quoted was no more

than was done in the case at bar.    Mrs. Fitzgibbons all the time supposed she was the lawful wife of Mr. Fitzgibbons, and he having so represented her to the public and to herself after the legal impediment passed away, it is but scant justice to Mrs. Fitzgibbons and to her child and to the public to hold that she was at the time he died his legal wife.

The judgment should be affirmed.

BIRD, C. J., and BLAIR and STONE, JJ., concurred with MOORE, J.