**524** MATTER OF SPONDRE.

Surrogate's Court, New York County, January, 1917. [Vol. 98.

Matter of the Application for Letters of Administration on the Goods, Chattels and Credits of HENRY SPONDRE, Deceased.

(Surrogate's Court, New York County, January, 1917.)

Jurisdiction — of Surrogate's Court — marriage — divorce — when application for letters of administration denied — evidence — when judgment not subject to review.

The Surrogate's Court not having cognizance of matrimonial causes should not in the exercise of its jurisdiction, unless imperative so to do, go behind a marriage long established by cohabitation and reputation.

The Jewish law of Rumania recognized divorces by rabbis, and such divorces are recognized in this jurisdiction.

A rabinnical divorce in Rumania may be proved by parol.

Where immigrants upon their arrival in this country represent themselves to be husband and wife and forever after live together as such, a common-law marriage between them will be presumed.

An application for the revocation of letters of administration upon an allegation that the administratrix in her petition for letters falsely suggested that her daughter was the daughter of the decedent, considered, and the application denied, it appearing that said suggestion was not made in bad faith.

The Appellate Division of the Supreme Court in the exercise of its original jurisdiction may substitute its own findings of fact on the evidence for the surrogate's findings, and its judgment is not subject to review.

APPLICATION to set aside letters of administration.

Albert & Albert, for petitioner.

Joseph Hamerman (Randolph N. Souffront, of counsel), for respondent.

FOWLER, S. This is an application brought on by the petition of Moses Spondre, the father of the deceased, to set aside our letters of administration

Surrogate's Court, New York County, January, 1917.   [Vol. 98.

granted in the ordinary course to Rachel Spondre, as the widow of Henry Spondre. It is averred that Rachel Spondre falsely suggested in her petition for letters of administration on the estate of Henry Spondre that she was such widow, a material fact, and next, that she falsely suggested that her daughter, " Goldie," was the daughter of said Henry Spondre, deceased. The application is made to me pursuant to subdivision 4, section 2569 of the Code of Civil Procedure, by the father of the deceased, claiming to be the only heir at law and next of kin of deceased. Rachel Spondre having joined issue on the allegation of the petition of the father, the issue of fact was set down for hearing.

The testimony taken illustrates one of the very curious phases of urban life in this cosmopolitan seaport, where of late years have come so many from the remoter parts of Europe. The deceased, his father and his family, as well as Rachel Spondre, all lived in the Province of Galicia, Austria, before their migration to this country. But it was in Rumania that the family or marital relations of Henry Spondre were constituted, quite in conformity, I think, with the curious license, which in some European countries, and even under some insular American governments, is tolerated.

It is the father of Henry Spondre who is seeking to revoke the letters of Rachel Spondre, and yet who is the main witness upon the matrimonial *status* of Rachel and Henry Spondre. If he succeeds in this proceeding he will take the little estate away from Rachel Spondre, who has always in this country lived as the wife of his son. The petition of Moses Spondre is signed by his mark, and yet I thought him not lacking in shrewdness or a certain sort of patriarchal dignity of demeanor.

Surrogate's Court, New York County, January, 1917.　[Vol. 98.

The testimony is in Yiddish, and the interpretation not very clear. The father, Moses Spondre, testifies in substance that some eighteen years since Rachel came to Yassi, probably Iassi, a town, I think, in Moldavia, Rumania, with her then husband, one Topelman, and her daughter, one " Goldie," already mentioned. While there they stayed in Moses Spondre's house at Iassi. Finally, this Topelman went away as a soldier and to a hospital as orderly, and then Henry Spondre, the son of Moses, and Rachel eloped from his father's house and went to Bucharest, Rumania. The father testifies in effect that he objected, as his son was betrothed to another girl, so he followed them to Bucharest and consulted " a schochet, who kills calves," to get his aid to induce Rachel to leave Henry Spondre, and he says " she would not." This is about all I can make of the father's testimony. If the father did object to Henry's first relations with Rachel, his testimony is circumstantially corroborated by some deference to ancient Jewish custom, as he states he consulted an agent of his faith about his son's first relations to Rachel. On examination I find that a " schochet " is not a religious officer, but one authorized by a Jewish community to slaughter cattle for people of this ancient faith.

Mollie Bass, the sister of Henry Spondre and the daughter of the petitioner, Moses Spondre, testifies that Henry Spondre and Rachel came finally to New York and Rachel then admitted to her that she was not married to Henry. Admissions claimed to be made to antagonistic witnesses are never a high order of evidence, and of themselves are insufficient to affect a *status* otherwise established. As it is, it is entitled to little weight, for the reasons I shall hereafter mention. Vague admissions are always overborne by facts which

operate as estoppels.   A person's admission of marriage is of no value on the question of *status*.

Rachel Spondre was then called by petitioner; she testified that she was now forty-three years old, which was confirmed by her much younger appearance on the witness stand, although Moses Spondre would make her out a very old woman, seventy or more, a gross exaggeration which shows bias, not enough to impeach him, but sufficient to affect the accuracy of the details of his testimony.   Rachel came many years ago to this country as the wife of Henry Spondre.   She states that she divorced Topelman " by a rabbi and married by a rabbi."   No documentary proof of divorce was offered or asked for, nor did she produce a " get."   None, I think, was necessary as one may always testify to his own *status* if it is not objected to by the adversary party.   A marriage or a birth certificate is not necessary to establish those events.   A " get " or Jewish " bill of divorce " is not, I think, essential to prove a Jewish divorce in the first instance.   The necessity of producing records in our law refers to our records only, for in Jewish law itself the production of a " get " to prove a divorce was unnecessary.   I find a singular confirmation of my own opinion on this point in an opinion of Lord Kenyon's in the year 1790. *Ganer* v. *Lady Lanesborough,* Peake's N. P. Cas. 17.

It was conceded by counsel on the record, at my suggestion, that Henry and Rachel Spondre lived together in New York for the last twelve years as husband and wife, and were known in their neighborhood as husband and wife until Henry Spondre died.   Petitioner was not prepared to prove that Rachel was not married to his son Henry Spondre, but his counsel rested on what he called " presumptions of the common law "— presumptions certainly formulated for and by a very

Surrogate's Court, New York County, January, 1917.   [Vol. 98.·

different civilization than that to which the parties to this proceeding originally belonged. Such common-law presumptions have scant relevancy to the eastern institutions of Rumania and Bulgaria. The only affirmative evidence, indeed, that Rachel ever at any time consorted with Topelman is furnished by Moses Spondre, the petitioner.

An important fact established is that Henry Spondre and Rachel came to our shores as husband and wife, and I will take notice of our own immigration laws requiring the marital relations to be truly stated by immigrants before their admission. There is some evidence also that " Goldie," the daughter of Rachel, was admitted to the country as Henry's daughter, and was thereafter treated by Henry Spondre as his own child. But there is no evidence of her formal adoption as such daughter pursuant to the laws of this country.

In Russia, Rumania and parts of Austria the marriage and divorce laws are different from those of this common-law country. Although the parties offered no evidence of the foreign law, yet for the purposes of this application I should take notice of such difference, or a great wrong may be done to Rachel Spondre. The evidence offered on the hearing, as is most always the case in the applications of the poorer people, was extremely inartificial and untechnical. To apply rigid legal formulae to such evidence is not always conducive to justice. The presumptions· of the common law of evidence have scant application to the circumstances of the parties, and the interests of good government and decent society are not furthered by their application to cases not conceived of by the *lex fori* where such presumptions originate.

While this is only an application to set aside letters of administration, the decision really involves affirm-

ing, or setting aside, a *status* of importance to the community. A decision which abrogates a marital relation of long standing, at the instance of a third party vitally interested in the result, ought to be entered on by a court of justice, having no jurisdiction in marital matters, with great caution, especially when it may concern a foreign *status,* recognized and enforced in the country of the spouses' own origin. At this point I am concerned that our law shall not be brought into disrepute with people of this sort. I am justified in this view of my duty by the fact that by our own law even where prior marriages of the spouses are technically proved, their second marriages, without divorce, are not always ignored in this jurisdiction. Indeed the parties seeking the annulment of the second marriage are often left without decree or relief when the higher interests of society so demand. *Erlanger* v. *Erlanger,* 173 App. Div. 767, citing *Berry* v. *Berry,* 130 id. 53, 56; *Stokes* v. *Stokes,* 198 N. Y. 301; *Roth* v. *Roth,* 97 Misc. Rep. 140. These decisions serve to indicate that a woman's second marriage, when a prior husband exists, is under some circumstances not void with us for all purposes, but voidable only, and then only when equity has first considered the rights of all parties to both marriages and also the rights of their issue, if any. But this proposition has reference rather to general principles of law than to the exigencies of this case, for here no prior marriage has been adequately proven, or if it has been proved its dissolution ought now to be presumed.

As surrogate I am always extremely loath to ignore an existing *status* on an indirect application like this before the court. It seems to me that *factum* of marriage alone should defeat this application, and that the surrogate should rest when an existing marriage is

34

once established, even though its validity may legally be questioned in a competent forum. Marriage is the most solemn and important of all civilized institutions, and in the past but few tribunals of this state have been intrusted with jurisdiction of an application to affect or to dissolve or to annul a marriage. Among the tribunals so intrusted the courts of the surrogates were never included. *Peugnet* v. *Phelps,* 48 Barb. 466; *Burtis* v. *Burtis,* 1 Hopk. Ch. 557; *Stokes* v. *Stokes,* 198 N. Y. 301; *Johnson* v. *Johnson,* 206 id. 561; *Walter* v. *Walter,* 217 id. 439. Why should the surrogate, then, do indirectly what he cannot do directly, at least when such adjudication is not made imperative on him?

I come at last to the merits of this application. Henry and Rachel Spondre first began their consortium in Rumania. They arrived in the port of New York as husband and wife, and as such husband and wife they lived here continuously until Henry Spondre died. Rachel swears she was divorced from Topelman by a rabbi and married by a rabbi. This evidence, I think, is not disproved. While a decree of divorce is undoubtedly the best evidence with us (*Tice* v. *Reeves,* 30 N. J. L. 314), yet no objection was taken to Rachel Spondre's testimony that she was divorced from Topelman by a rabbi. Secondary evidence of a Jewish divorce, in the absence of all objection, is certainly sufficient *prima facie* on an application of the kind now here. In our law one may always testify to his own *status,* even when there is better evidence, *e. g.,* one's marriage, one's birth, one's age, one's citizenship, domicile, nationality, or one's blood relationship, and why not to a divorce, especially a Talmudical divorce, where no record is suggested to exist? With us, as shown elsewhere, a divorce from a former marriage may even be presumed to support a subsequent com-

mon-law marriage. When I come to consider the element of divorce I shall glance at the Talmudical law regulating rabbinical divorces in Russia and Rumania. I have shown before that the woman may prove her own divorce, and that this is recognized in our common law.

It may, I think, be presumed here from the facts conceded that Henry and Rachel contracted a common-law marriage on the high seas, or at the entrance to this port within the three-mile limit, or even in the harbor. A common-law marriage was certainly permissible in the instance of Henry and Rachel, especially after so great a lapse of time since the disappearance of Topelman, who, indeed, from the vague evidence given in, may never have been married at all to Rachel. *Kresh* v. *Kresh,* 58 Misc. Rep. 461. Common-law marriages have always been recognized in this state, except from the period from January 1, 1902, to January 1, 1908. Laws of 1901, chap. 339; Laws of 1907, chap. 742; *Gall* v. *Gall,* 114 N. Y. 109; *Matter of Hinman,* 147 App. Div. 452; affd., 206 N. Y. 653; *O'Gara* v. *Eisenlohr,* 38 id. 296; *Bissell* v. *Bissell,* 55 Barb. 325; *Matter of Garner,* 59 Misc. Rep. 116, 119. Common-law marriages on the high seas within the three-mile limit are good marriages. *Hynes* v. *McDermott,* 91 N. Y. 451. The necessary declarations of Henry and Rachel Spondre to the commissioners of immigration at the port of New York, of themselves constituted, at common law, a perfectly good contract of marriage *per verba de praesenti.* Their cohabitation and union is not denied and, indeed, is established beyond all peradventure.

It should not be overlooked that Topelman, the first consort of Rachel, or husband if husband he was, disappeared from the matrimonial scene many years ago

—more than seven — and it sufficiently appears, I think, that he has since given no sign of life. The presumption of the death of Topelman on an indictment of Rachel for bigamy would justify her acquittal after seven years, if not before. *State* v. *Plym,* 43 Minn. 385. Any time after seven years, if not before, she would be competent to contract her marriage with Henry Spondre. *Reg.* v. *Willshire,* L. R. (6 Q. B: D.) 366.

If we inquire what other evidence besides that denoted above there may be of such marriage, let me say *that evidence,* which I had always believed until lately was universally regarded as the highest kind of evidence known to the law of civilized peoples — I refer to reputation and cohabitation. *People* v. *Humphrey,* 7 Johns. 314; *Hynes* v. *McDermott,* 91 N. Y. 453, where all the authorities are reviewed. Such proof is competent in all cases except proceedings for bigamy, divorce or damages for adultery. *Morris* v. *Miller,* 4 Burr. 2057; 1 Wm. Black. 632. So strong is this order of proof of marriage that even where it establishes a second marriage after a prior one a divorce from the first marriage will be presumed to support the second marriage. *Blanchard* v. *Lambert,* 43 Iowa, 228; 22 Am. Rep. 245. All such decisions proceed from that established maxim of our law " *semper praesumitur pro matrimonio.*" It was with this familiar principle fully in view that I said on the trial of this application: " I shall require the alleged marriage to Topelman to be proved with the same strictness, as on an indictment for bigamy, before I will ignore, on this application, a subsequent marriage long established by reputation and cohabitation in this city."

That Henry and Rachel Spondre were married under the old law of this state, their arrival in this port as husband and wife, followed by their long cohabitation

in this city and by the established general repute of their marriage, sufficiently demonstrates for this matter. Henry and Rachel Spondre came together to this country, representing themselves to be husband and wife. There is a curious and extremely instructive decision on the effect of such a representation and one entirely familiar to Roman lawyers. The classical case was in brief this: Certain slave dealers, landing a cargo at Brindisium, a port of entry, some two thousand years ago, had among their cargo a young slave of great value by reason of his intellectual culture, but, fearing that the custom house officers would lay hands on him, the slave dealers represented the youth, contrary to the fact, to be free. It was held at Rome that he was a free man by reason of the misrepresentation. This judgment strikes me as most just. So here, if Henry Spondre and Rachel took themselves to be husband and wife in order to come under this government, they should, I think, be concluded in the courts of this government by their representation; or in any event their representation should be taken against themselves as conclusive evidence of their common-law marriage if not constituting it. If, then, both Henry and Rachel were estopped by their action from denying their marriage as to all the world, except perhaps the mysterious Topelman, who is *non est* for all the purposes of this case, certainly Moses and all those claiming under and through Henry Spondre ought to be bound by Henry's action and representation.

The only evidence against the marriage *status* of Rachel and Henry Spondre proceeds from the petitioner, Moses Spondre, who seeks to take the estate of his son Henry Spondre away from Rachel. It is a rule of practice, as contradistinguished from a rule of law, that courts of the common law will not act upon the

Surrogate's Court, New York County, January, 1917.    [Vol. 98.

uncorroborated testimony of claimants to estates, unless convinced that such testimony is true. *Rawlinson* v. *Scholes,* 79 L. T. Rep. 350, following *Re Hodgson, Beckett* v. *Ramsdale,* 31 Ch. D. 177, 183; Cockle's Cas. 124. I have frequently acted on this rule in this court and I hope generally with the approval of the appellate courts whenever the principle applied has come up for review.

But we need not, I think, rest this matter on any mere refinement or disputable presumption of law. Rachel Spondre, herself called for petitioner, without objection as I have said, testified to her divorce from Topelman by a rabbi. Now divorces of those of the Jewish faith by their rabbis in Russia and Rumania, I will take notice for the purposes of this application, are valid, and the subsequent marriages of such divorced persons are consequently recognized as valid by the law of the *locus contractus,* to use our own technical phrase, or rather they are valid under the principle " *locus regit actum.*" *Status* of marriage is ordinarily fixed by the law of the place of marriage. Rabbinical divorces being recognized in Rumania are valid in this jurisdiction. *Leshinsky* v. *Leshinsky,* 5 Misc. Rep. 495; *Miller* v. *Miller,* 70 id. 368; *Weinberg* v. *State,* 25 Wis. 370 (1870); *Sokel* v. *People,* 212 Ill. 238 (1904).

Although not so in this country, in Russia and Rumania the Jewish communities constitute a sort of *imperium in imperio,* as the state allows them to divorce themselves, according to their own laws, the Mosaic Code, embodied in the Pentateuch, and commented on or modified in the Talmud. The jurisprudence of so old and so great a people as the Jews is naturally not inferior to the jurisprudence of other cultivated races. One is apt to forget what Renan pointed out in France, that modern law has three great

originals — Greek, Jewish and Roman.  Our own law owes most to the law of Israel.  The lower classes of Jews, the peasants and the industrials of the towns in Rumania, avail themselves liberally of the permission indicated, although the Jewish nobility and the aristocratic people of the Jewish faith generally prefer for greater security to property the additional or ancillary sanction of the ordinary courts of a European country. But as this last is an obscure branch of Jewish law I need not enter on it, as it does not affect this proceeding.

It must not be forgotten that as among people of all other faiths the Hebrew community is not, in Europe, equalitarian.  Some of them, in the terms of the European sociology, have long belonged to the higher nobility, which in European countries still counts for much, although more are of the class known as *" petite noblesse,"* in Europe a negligible rank, but most are classed as bourgeois or peasants, as is the case with European peoples of other faiths.  Now, religious observances and laws are — and it is unfortunate that it is so — most strictly complied with in all races by the humbler classes of any faith.  Henry and Rachel Spondre were evidently Jews of the lower order.  She would doubtless feel obliged to resort to the rabbi for a divorce, and both would resort to the rabbi for their subsequent marriage, just as she testified was the fact. I have already referred to the law regulating divorce in Rumania, as well as to our own common law of marriage.  The Mosaic and Talmudical law of marriage and divorce can be found stated generally in such works as Amrams' " Jewish Law of Divorce " and Henriques' " Jewish Marriages and the English Law," and Year Book, American Rabbis, Volume XXV, and also in the " Treatise on the Jewish Law of Marriage

Surrogate's Court, New York County, January, 1917.   [Vol. 98.

and Divorce '' by the Rev. M. Mielziner, of the great Hebrew college at Cincinnati, all instructive and excellent books of the law.   Jewish law in Russia and Rumania constitutes what we know in our own law as '' *jus moribus constitutum*,'' being recognized as a particular law for a portion of the community only.

The counsel for the petitioner, with a deft ingenuity, chooses to rest on some favorable presumptions of the common law, ignoring all the law I have referred to. He gave no proof of foreign or Jewish law, and no documentary proof of any kind.   The certificate of Henry Spondre's naturalization was produced, and it states that Henry Spondre was married to Rachel, and that '' Goldie '' was his own daughter.   The trouble is not with the common-law presumptions counsel invokes, but with their irrelevancy to the state of facts disclosed.   This playing back and forth in a litigation with logical see-saws I abhor, when it is not loyal to justice.   On the facts shown the briefs throw little light which would aid me in reaching any just conclusion. When Rachel Spondre, in her simple testimony, swore to a divorce and marriage by a rabbi, her testimony at once challenged my attention.   It introduced something of importance to her, and its validity ought fully to be considered or justice may fail this poor woman.

In regard to Rachel Spondre's alleged false suggestion as to her daughter being the daughter of Henry Spondre, I am convinced it was not made in bad faith. Intention is the main element of a false suggestion. Henry Spondre evidently regarded Rachel's daughter as his own daughter.   It is so stated in his American certificate of naturalization, issued in the year 1912. The child certainly lived with him as his daughter, and he ultimately married her off, acting as her father. Henry evidently regarded '' Goldie '' as his daughter

and the principle of adoption *per subsequens matri-monium* may apply.   There is in any event just enough justification for Rachel's simple suggestion that " Goldie " was Henry's daughter to rob it of all elements of falsity.   The validity of " Goldie's " claims can well be reserved for the decree of distribution.   On all the facts stated I feel inclined to deny the present application.   I should do this with little hesitation were it not for a recent decision of their honors in the Appellate Division of this department rendered in *Matter of McDonough,* 175 App. Div. 367.   I confess that decision somewhat weakens my resolution in this matter.   The appeal was one from my own order and I am therefore entirely conversant with the facts — facts not dissimilar to those here.   As said in *Matter of Leland,* 219 N. Y. 387, " reasonable men may reasonably " differ about facts.

In *Matter of McDonough* the Appellate Division did not sit as a court of review, but it exercised its original jurisdiction as trier of an issue of fact in this court and substituted its own findings of fact for mine.   The Appellate Division, in the exercise of its original jurisdiction, as contradistinguished from its appellate jurisdiction, may lawfully substitute its own findings of fact for the surrogate's.   It does not then so act as a court of error or review, nor is it amenable to the universal common-law rule of appellate procedure, that findings of fact below can only be disturbed above for manifest error of law.   When the Appellate Division so exercises its original jurisdiction its judgment is subject to no review whatever.   *Matter of Leland,* 219 N. Y. 387; *Matter of Martin,* 80 Misc. Rep. 20, 24; Code Civ. Pro. § 2763.

How far the judgment of the Appellate Division in *Matter of McDonough* also involved the denial of the

Surrogate's Court, Onondaga County, January, 1917.  [Vol. 98.

principles of law on which I have decided this case now here I am not precisely advised. It may negative them; I do not know. This being so, after due consideration I think it better for the present to deny the application of Moses Spondre, with the satisfactory assurance that if I am in error he will not be prejudiced, as such error can be promptly corrected in the appropriate place.

Application denied.