CHARLES J. SORENSON, Plaintiff, v. OLGA KRISTINE SORENSON, Defendant.

Supreme Court, Kings Special Term, December, 1923 (Received January, 1924).

Husband and wife — Danish divorce — decree issued by the king binding — common-law marriage established — when plaintiff not entitled to decree annulling marriage — defendant cannot counterclaim for separation in action to annul a marriage.

In an action to annul a marriage, the evidence established that the defendant, about a month after her marriage in Denmark, at the age of eighteen years, came to this country with her brother, her husband remaining in Denmark. Three years later defendant, who had known plaintiff ever since her arrival in this country, was married to a relative of his, one W., and plaintiff was present at that ceremony. Three years after said marriage W. died and later plaintiff and defendant went through a marriage ceremony in Brooklyn, N. Y., where defendant has resided ever since. Some months after said marriage defendant on a visit to the office of the Danish consulate in the city of New York, made in relation, as she testified, to a divorce from the man she had married in Denmark, was shown certain papers and she signed a paper. The testimony was convincing that defendant absolutely believed that in this country she had become free from any status of citizenship in Denmark and free from the marriage there celebrated. Some months later defendant received a paper from the Danish consul which by competent expert testimony was established as a perfectly legal and binding decree issued by the king of Denmark in due and regular course of Danish procedure, divorcing the husband in that country from the defendant herein. *Held,* that her submission to the jurisdiction of the Danish court by voluntary appearance rendered said decree of binding force and effect.

The fact that for some twenty-two years after the Brooklyn marriage the parties lived together as man and wife with the exception of brief periods where in one instance defendant returned to Denmark for a short visit and one or two occasions where plaintiff left defendant and his daughter, now twenty-one years of age, but returned again to his family, was ample proof of a common-law marriage between the parties to this action, and the prayer of the complaint will be denied, but defendant's counterclaim asking for a separation under section 266 of the Civil Practice Act must be disallowed upon the ground that there is no warrant in law for such a pleading.

ACTION to annul a marriage.

*William H. Good,* for plaintiff.

*George C. Howard* (*Richmond L. Reese,* of counsel), for defendant.

DIKE, J.  This action is brought to annul a marriage; the defendant enters a general denial and interposes a counterclaim asking for a separation.  On the 11th of January, 1891, Johannus Marinus Jans Peter Westerdahl married this defendant, the marriage taking place at St. Saviours Church, Copenhagen, Denmark.  About a month after said marriage defendant came to this country with her brother, her husband remaining in Denmark.  She was then a young girl of about eighteen.  On May 26, 1894, the defendant married Rudolph Wermuth.  It appears that the plaintiff knew both of the contracting parties and was present at this ceremony.  In fact, defendant testifies that Wermuth was related to the plaintiff and it appears that the defendant had known the plaintiff Sorenson ever since she arrived in this country from Denmark.  In 1897 the said Wermuth died and in May, 1900, the plaintiff and the defendant herein went through a marriage ceremony in the borough of Brooklyn, city of New York and the defendant has ever since that time resided in this borough of Brooklyn.  It appears that some months after the said ceremony of marriage between plaintiff and defendant, a communication was received from the Danish consul by the defendant, in response to which the defendant presented herself at the Danish consulate in the city of New York, borough of Manhattan, where certain papers were shown to her.  A paper was signed by the defendant at the office of the consul.  The defendant testified that the visit at the consul's office was in relation to a divorce from Westerdahl.  It is of importance at this point that a word of description of the defendant be made a part of this opinion.  In a case that has developed on the peculiar and interesting lines that this one has, the personality of the parties becomes of great importance as to their credibility.  It must be remembered that the defendant came to this country from Denmark as a woman not matured, a woman, I believe, reserved, domestic and unworldly, one who, in her own country, would have been a quiet *haus frau*, as she would have been called in Germany.  It is easy to infer that she had little realization of our laws or customs at the age when she arrived in this country, or even of those of her native country, which may account for her attitude towards the Danish marriage.  Conversations were had with friends upon the effect of that marriage and with a deacon of her church, and defendant testified that the minister marrying her to plaintiff knew all about the marriage with Westerdahl, so that her attitude in this country was that she " had nothing to do with Denmark any more."  I am convinced that the defendant absolutely believed that in this country she had become free from any status of citizenship in Denmark and free from the marriage ceremony performed

in that country with Westerdahl. Some months after the episode in the office of the Danish consul in New York city, the defendant received a paper from that official. It is testified that it was a legal paper and the defendant testifies as follows: " I sat on my husband's knee and showed him my divorce paper and we laughed over it." They laughed over the formal phraseology of the document and it is testified that the paper was read by both plaintiff and the defendant, the paper afterwards being destroyed. About a year afterwards her daughter Beulah was born and the parties to this action lived together for some twenty-two years, with the exception of brief periods. In one case the defendant returned to Denmark for a short visit and on one or two occasions the plaintiff left the defendant and his daughter, but returned again to his family. What was the nature of the proceeding as regards the so-called Danish divorce? Expert testimony by a Danish attorney, practicing in that country for many years before coming to the United States and being admitted to practice in the courts in this state, was received. Julius F. Ohlman, the Danish attorney, testified that there are two methods of obtaining divorce from the bonds of matrimony in Denmark; one, a divorce and a record of action in court, with a decree by judges, and another, allowed under the code, being a divorce by royal decree issued by the king. Such a decree, dated October 5, 1900, granted under the hand of the sovereign, was admitted in evidence and is a part of the record in this case. Ohlman testified that the proceedings described in said decree were perfectly regular; that the appearance of the defendant in the Danish action was perfectly regular under the Danish procedure; that the status of the defendant, should she remarry, would be perfectly valid under the decree in evidence. It seems to me, from the evidence relating to the Danish custom relating to divorce, that I must find this Danish decree a perfectly legal and binding one divorcing Westerdahl from the defendant. This kingly decree, it seems to me, is possibly a survival of the old kingly prerogative such as one finds formerly existed in many countries of Europe. It is in fact the very highest power in the land, certainly of equal force and effect with the decree of a court, and it seems to me there is ample authority under our law for such conclusion. The attitude of our courts towards rabbinical divorces is an illustration of the rule. *Matter of Spondre,* 98 Misc. Rep. 524, where a rabbinical divorce in Roumania was proved by parol. Surrogate Fowler (at p. 529) said: " At this point I am concerned that our law shall not be brought into dispute with people of this sort. I am justified in this view of my duty by the fact that by our own law even where prior marriages

of the spouses are technically proved, their second marriages, without divorce, are not always ignored in this jurisdiction.   Indeed the parties seeking the annulment of the second marriage are often left without decree or relief when the higher interests of society so demand.   *Erlanger* v. *Erlanger* 175 App. Div. 903." See, also, *Leshinsky* v. *Leshinsky*, 5 Misc. Rep. 495, 497; *Saperstone* v. *Saperstone*, 73 id. 631, 634, 635.   Furthermore, it is entirely consonant with our attitude towards the principle of comity between our country and foreign nations that divorce proceedings instituted, as I am bound to find here, by the voluntary appearance of this defendant, should be recognized and that full faith and credit should be given to the decree, a copy of which, at least, I find was received by this defendant and shown to the plaintiff.   In the case of *Gould* v. *Gould*, 235 N. Y. 14, 25, the Court of Appeals held: " In providing that the judicial proceedings of foreign jurisdictions, when authenticated as prescribed by it, should be evidence, expressly omitting to declare the *effect* of such evidence, clearly indicates that it intended that the *effect* of the evidence should be determined by the court in which an action or proceeding was pending and in which action or proceeding a judgment of a foreign jurisdiction was relied upon in whole or in part to establish or defeat a material issue therein."   And also, in that same case, quoting the case of *Hubbard* v. *Hubbard*, 228 N. Y. 81, the court says:   " ' Whether or not the operation of a foreign decree of divorce in a given case will contravene the policy or wrong or injure citizens of the state is exclusively for its courts to determine.   They are the final judges of the occasions on which the exercise of comity will or will not make for justice or morality.   The exercise rests in sound judicial discretion guided and controlled by the policy of the state, relevant judicial decisions and the circumstances of the case.' "   The defendant had an idea that she was free from any binding ties in Denmark when she arrived in this country.   In this she was mistaken.   She endeavored to correct this error by submitting to the jurisdiction of the Danish king when she voluntarily appeared before the consul in New York.   At the time she married the plaintiff, therefore, her marriage to Westerdahl was still in full force and effect.   These people have been caught in a net of circumstance, which they have either consciously or unconsciously helped to contrive and from which only a court of equity may help them to escape.   The records of our court are full of solutions of such dilemmas.   The Danish divorce, however, I hold to be legal, and so far as the proceedings went the matrimonial domicile of the defendant was still Denmark and the matrimonial domicile, so far as

Westerdahl was concerned, was still Denmark and that state retained jurisdiction of the *res,* even though the defendant here had left the jurisdiction. *Gould* v. *Gould,* 201 App. Div. 670, 673; affd., 235 N. Y. 14; *Atherton* v. *Atherton,* 181 U. S. 155; *Thompson* v. *Thompson,* 226 id. 551; *Perkins* v. *Perkins,* 225 Mass. 82, 87. The submission of this defendant to the jurisdiction of the Danish court, by her voluntary appearance, rendered the decree of binding force and effect. *De Meli* v. *De Meli,* 120 N. Y. 485, 495; *Gould* v. *Gould, supra.* Within two or three months, therefore, after the marriage ceremony had been performed between the plaintiff and the defendant herein, there was no impediment then to her marriage to the plaintiff. But this step was not taken for some reason or other. Whether it was through carelessness or through the belief, as defendant urges, that she was legally married to the plaintiff, it is not necessary to discuss here. The fact remains, however, that for some twenty-two years after that day this plaintiff and this defendant lived together as man and wife. The plaintiff admits it. There is not one suggestion in this case that this common-law marriage, as it certainly is, was based upon meretricious relations. It began under the sanction of the church by a marriage ceremony, mistaken in fact, in its force and effect, but so far as the outward act, one sanctified by the church. Where such a union is moral in its inception the courts would be quick to infer the continuance of such moral relations and not attribute to it illegal qualities. During all these intervening years there is not one word in the case that this defendant was not a devoted wife and mother. The plaintiff's attitude may be determined in no better way than by the letters of this plaintiff to the defendant and his daughter during his absences from home. The admission of the plaintiff as to holding out the defendant as his wife and recognizing her as his wife eliminates the necessity of any further discussion as to the ample proof of the common-law marriage between these two. I find, therefore, clearly proven in this case a common-law marriage and that the authorities amply sustain that conclusion. *Leeds* v. *Joyce,* 202 App. Div. 696; affd., 236 N. Y. 620; *Rose* v. *Clark,* 8 Paige, 576, 579; *Matter of Wells,* 123 App. Div. 79; affd., 194 N. Y. 548. But the exceedingly well-considered case of *Applegate* v. *Applegate,* 118 Misc. Rep. 359, would, in itself, support such a conclusion. There Mr. Justice Lazansky most elaborately reviews the cases and sustains the conclusion that I have arrived at in this case. In quoting (at p. 366) from the case of *Eaton* v. *Eaton,* 66 Neb. 676, the court said: " ' If the parties live together and intend to sustain toward each other the relation of husband wife, they are, in the absence of any impediment fatal to that relationship, legally married. The

marriage between the plaintiff and the defendant was an attempt made in good faith to form a legal union. Both intended to live in wedlock. In the absence of an impediment to the marriage, no ceremony would have been required; the mutual consent of the parties would have been sufficient. When the impediment was removed, why may not consent be inferred from continued cohabitation? ' " The solemn importance of the marriage relation is my excuse for this extended discussion in this interesting case. It is a relation of vital importance to the state, and it is one of vital consequence to the parties here involved, the husband and wife, who are the father and mother of this girl now twenty-one years of age. A court of equity is called upon to decide the difficult problem that has arisen in their lives. I cannot feel that this defendant, the wife and mother, is anything but blameless. I cannot feel that she has intended, by any act that has been brought to my attention, to commit a wrong or break a law. She might have been protected by this plaintiff, who lived with her for twenty-two years as her husband, by his having a second ceremony of marriage performed between them. I cannot lend any aid to this plaintiff who now, it seems to me, in the autumn of defendant's life seeks to repudiate a relationship which for more than a score of years he openly and concededly enjoyed, and to put aside her who had devotedly served him as wife and with a faithfulness that the evidence would indicate was not reciprocal. In *Stokes* v. *Stokes*, 198 N. Y. 301, 312, the opinion of Vann, J., concludes with these words: " While it may well be that there are extreme cases where the position of the party seeking relief of the kind sought here is so inequitable that a court of equity will refuse to interfere, no such defense was pleaded or sufficiently proved in the case before us." And here in the instant case I feel that we have one of the " extreme cases," where this plaintiff, in seeking to be free from this wife of his youth and who seeks to be free from her in her years of maturity, should not succeed. He may have found some one else, as is indicated in the evidence, but I cannot feel that the law will make it possible for him to turn his back upon the obligations that he assumed toward this defendant up to the time when he abandoned her and his daughter. A vital question of practice is presented to the court. Plaintiff is asking for an annulment of his marriage to the defendant. His action, therefore, is purely statutory and must be determined by the rules that obtain in purely statutory actions as there regulated. The power of the court in granting relief in matrimonial matters is found in four articles (67, 68, 69 and 70) of the Civil Practice Act. Article 67, " Action to annul a marriage," makes no provision for counter-

claim.    Here the defendant has interposed a counterclaim asking for a separation under section 266 of the Civil Practice Act.    There is no warrant in law that I have been able to find for such a pleading. However great the hardship, our practice does not permit it.    The legislature alone could afford relief in this regard.    There is much logic also in the procedure that forbids a separation question and an annulment to be adjusted in the same cause of action.    They are wholly inconsistent.    A separation assumes a marriage, while an annulment assumes no marriage or at least no legal marriage. The authorities that would uphold this are *Taylor* v. *Taylor*, 25 Misc. Rep. 566; *Levy* v. *Levy*, 148 N. Y. Supp. 417, and many others.    My conclusion is, therefore, that the counterclaim of the defendant must be disallowed.    The admission of the plaintiff as to the abandonment will make it a matter of no difficulty for her to secure the separation that she seeks from this plaintiff.    The relief to the plaintiff is denied under the power that I feel is possessed by a court of equity, and I give judgment for the defendant.

Judgment accordingly.