GOODSPEED *v.* GOODSPEED.

1. MARRIAGE—HUSBAND AND WIFE—COMMON-LAW MARRIAGE.

Although the marriage ceremony between plaintiff and defendant was void because performed before the granting of a decree of divorce to plaintiff's former husband, where the parties continued to live together after the granting of the decree, holding themselves out to the world as husband and wife, *held*, that the relation of husband and wife existed.

2. DIVORCE—PROPERTY SETTLEMENT—RESCISSION.

A property settlement between plaintiff and defendant, in contemplation of divorce proceedings between them, may not be repudiated by plaintiff on the ground that defendant was worth more than he represented himself to be, where his financial standing was investigated by plaintiff and her counsel before the settlement contract was entered into.

3. SAME—COSTS.

Where litigation was not avoided as contemplated in the settlement, *held*, that plaintiff should be awarded costs in addition to amount agreed upon therein.

4. SAME—CRUELTY.

Evidence *held*, insufficient to sustain plaintiff's averments of cruelty.

5. SAME—MORAL LAXITY.

Evidence of a moral laxity on the part of the plaintiff utterly incompatible with the marriage relation, *held*, to establish a cause for divorce.

6. SAME—CUSTODY OF CHILD.

In such case the custody of an 11-year-old boy should be given to the husband, with an arrangement for the wife to have him with her at proper times and occasions.

Appeal from superior court of Grand Rapids; Dunham, J. Submitted April 4, 1918. (Docket No. 32.) Decided December 27, 1918. Rehearing denied May 1, 1919.

Bill by Maude I. Goodspeed against John W. Good-

speed for a divorce. Defendant filed a cross-bill for affirmative relief. From a decree for defendant, plaintiff appeals. Reversed, and decree entered.

*Charles B. Cross* and *Charles R. Brown,* for plaintiff.

*Thomas P. Bradfield (Kleinhans, Knappen & Uhl,* of counsel), for defendant.

MOORE, J. Plaintiff filed her bill for divorce in this cause on September 30, 1916, alleging extreme cruelty and fraud on the part of defendant in the procuring of a property settlement from her, and praying for appropriate relief. Defendant answered and filed a cross-bill alleging that the parties never were husband and wife, and praying that the trust fund of more than $30,000 mentioned in the property settlement be restored to him, or if the court should find the parties to be husband and wife, that a divorce be granted him on the ground of extreme cruelty. Both parties sought the custody of the minor child. The court made a decree dismissing the bill for divorce, adjudging plaintiff never to have been the wife of defendant, cancelling the settlement which had been agreed upon after their separation, giving to defendant the custody of the minor child, restraining plaintiff from the use of the Goodspeed name, and refusing an allowance of attorneys' fees. The case is brought here by appeal.

The printed record of more than 1,900 pages presents an unsavory story which it is neither possible or desirable to relate in detail. In the fall of 1905 the parties became acquainted with each other in Grand Rapids. Mr. Goodspeed was a widower 46 years old with two children. The plaintiff was an undivorced woman 25 years old, the mother of two children. The acquaintance ripened into intimate friendship with amazing rapidity. During the win-

ter of 1905 and 1906 the parties agreed to be married as soon as the husband of the plaintiff obtained his divorce in Chicago. The plaintiff claims that defendant agreed to pay the expenses of the Lawshe divorce case, and assumed the whole responsibility therefor; that on April 5, 1906, after an interview with an attorney of Chicago (now a municipal judge) to ascertain the status of the divorce case, that the defendant told plaintiff they could get married anywhere outside of Illinois; the defendant denies this and says he got all his knowledge about the divorce from the plaintiff. The testimony of the Chicago attorney was taken, and, while it is not very conclusive, so far as it has probative value, it tends to support the claim of the plaintiff. April 6, 1906, the parties went before a clergyman at Laporte, Indiana, and a marriage ceremony in due form was performed. The record shows such relations existed between them at this time that it was high time they were married. They returned to Grand Rapids and went to keeping house in a home owned by the defendant. It turned out later that the Chicago divorce was not granted until May 4, 1906, and it is conceded the ceremony performed at Laporte did not result in a legal marriage.

The first question presented is, Did what was done subsequently create the relationship of husband and wife? There is a great mass of testimony to the effect that they regarded themselves and were generally regarded as husband and wife. We quote the following from the testimony of defendant:

"I was always a great home man; I loved my home. Very shortly, almost immediately upon our return to Grand Rapids after the marriage, we attended a ladies' aid society at St. Mark's church at North Park and met a great many of my friends and acquaintances from St. Mark's. I introduced her to quite a good many people as my new wife. We lived in the relation of husband and wife during the entire seven

years except the last year. The year prior to our separation we lived apart. We agreed to disagree."

It was at about this time that a property settlement was agreed upon from which we quote:

"Whereas because of certain irreconcilable differences between John W. Goodspeed, of Grand Rapids, Michigan, party of the first part, and Maude I. Goodspeed, his wife, of the same place, party of the second part, the said Maude I. Goodspeed has recently left the home of said John W. Goodspeed, * * *

"Now therefore this agreement made and entered into this 18th day of June, in the year one thousand nine hundred and thirteen, between said John W. Goodspeed and Maude I. Goodspeed, witnesseth as follows:

"The parties to this agreement are husband and wife and were married in 1906, Mrs. Goodspeed, at the time she married had one daughter living by her previous husband; the daughter's name is Loraine Lawshe. For the past three years Loraine, who is now fourteen years of age has resided and made her home with Mr. and Mrs. Goodspeed and has gone by the name of Loraine Goodspeed, and has been supported entirely by Mr. Goodspeed.

"The parties have one child as the issue of their marriage, a son named John W. Goodspeed, Jr., now six years old.

"The parties since their marriage have lived in the city of Grand Rapids, where the husband lived for many years before their marriage. The husband is now fifty-three years of age and the wife is now thirty-two years of age. * * *

"Now, therefore, it is mutually agreed by and between the said John W. Goodspeed and Maude I. Goodspeed, that they having separated and ceased all marital relations with each other, that the said John W. Goodspeed party of the first part, will make and execute under his hand, his certain promissory note in writing bearing date the eighteenth day of June, A. D. 1913, for the sum of thirty thousand dollars payable to the said party of the second part. * * *

"That the said John W. Goodspeed, party of the first part, shall also pay to the second party the sum

of six thousand dollars for the purchase of a home and furnishings therefor in the city of Grand Rapids, the title of said property to be in the name of said Maude I. Goodspeed alone, within five years from this date.

"It is further understood and agreed that Maude I. Goodspeed shall have the right to remove from the former home of the parties and retain as her own, the following articles:    *    *    *

"Said Maude I. Goodspeed agrees that she shall and will not at any time hereafter claim, demand or require any support or maintenance from him, the said John W. Goodspeed, other than the amounts hereinbefore provided.    *    *    *

"And the said Maude I. Goodspeed by these presents and in consideration of the premises, forever releases to the said John W. Goodspeed all and all manner of claims and demands upon interest in the property and estate of the said John W. Goodspeed, of every name and nature which she now has or hereafter may have as the wife of him, the said John W. Goodspeed, or under the intestate laws of Michigan or any other State, or otherwise or on any other account whatsoever.    *    *    *

"The provisions of these presents shall continue whether or not either party hereto shall procure or attempt to procure a divorce from the other, and no decree of divorce shall change the property rights from the manner herein provided; and in case a divorce is hereafter obtained by either party, this settlement shall be in full of alimony, permanent or temporary."

The divorce was granted May 4, 1906. One year and eighteen days thereafter a boy was born that was afterwards named John W. Goodspeed. On the 11th of April, 1917, the defendant, though he wants the marriage relation discredited, acknowledged before a notary public in writing—

"that the male child, John W. Goodspeed, Junior, to whom my reputed wife Maude I. Goodspeed heretofore gave birth on the 22d day of May, 1907, is my child, and that I am the father thereof."

This acknowledgment was filed with the register

of probate for Kent county. It is said it was done under 4 How. Stat. (2d Ed.) § 10962 (3 Comp. Laws 1915, § 11798).

There were many letters introduced in evidence addressed, My Dear Wife, and containing expressions of endearment such as sometimes characterize the correspondence of married people when they are temporarily absent from each other. Deeds and other papers were signed and acknowledged by the plaintiff as the wife of the defendant.

The question presented is not a new one in this State. It was considered in *Barker* v. *Valentine,* 125 Mich. 336 (51 L. R. A. 787), where there is a considerable collation of the authorities to be found. It is also considered in the case of *Medland* v. *Houle Bros.,* 202 Mich. 532, in which an opinion was handed down July 18, 1918. These cases are controlling of the instant case, and it should have been decreed that the parties were husband and wife, and it will be so decreed in this court.

It was stated on the oral argument by one of the counsel for the defendant that if we found the parties were husband and wife that the settlement should stand. On the other hand it is claimed that when the settlement was procured defendant was a much wealthier man than he represented, that instead of being worth but $100,000 as he stated, that he was worth two or three times that amount, and that the settlement was procured by fraud and should be very materially increased. A reading of defendant's testimony satisfies us that he was and is worth much in excess of $100,000. Plaintiff was represented by able counsel who made some investigation of Mr. Goodspeed's financial standing, and the conferences in relation to a settlement were postponed from time to time to enable him to do so. While he was not aided

204—Mich.—4.

in these investigations by the defendant or his counsel he conducted them until he was satisfied he was worth $250,000 or $300,000. We now quote some of counsel's testimony:

"*Q*. Did you have any talk with either Mr. Goodspeed or Mr. Bradfield who represented him, as to starting a suit?

"*A*. I think I talked to Mr. Bradfield about that, yes, at various times.

"*Q*. What talk did you have with him?

"*A*. My recollection is the substance of it was, that I was not anxious to begin a lawsuit in this matter on account of the nature of the testimony and the allegations that would have to be made, and that I was anxious to get it settled out of court for that reason.

"*Q*. Is that about all that there was to the conversation?

"*A*. No, I wouldn't say it was all; I think there was some talk—this particularly was in my mind; we had a lot of interviews."

It is fair to assume that Mrs. Goodspeed and her counsel considered all phases of the case before entering upon the written agreement. The financial settlement contemplated that divorce proceedings might be brought and if brought it did not justify an attempt to repudiate the contract.

The record shows the plaintiff brought nothing to Mr. Goodspeed and it does not appear that she was instrumental in helping to acquire the property. It is apparent that the desire to avoid litigation was an important factor in bringing about the settlement; that has not been done, not only has the defendant repudiated the relationship of husband to the mother of his boy, but he sought an opportunity through litigation to repudiate a solemn written agreement entered into by him. If Mrs. Goodspeed is required to pay the expenses of this unfortunate litigation it will make a great inroad upon the amount of the settlement. We think an allowance ought to be made large

enough to enable her to pay all the costs of her litigation and keep the funds agreed upon in the settlement. We fix this amount at three thousand dollars which shall be in lieu of all other costs and the settlement shall in all other respects stand.

We now approach the most difficult question in the case. Does a cause for divorce exist, and, if so, in whose favor. The plaintiff says she cannot live with the defendant because of his conduct, she was so miserable and unhappy; we quote from her testimony:

"Then we had had a quarrel over some little thing and I was just all worn out and I said I wanted to die. So there was two different times that I took an overdose of headache powder; one time I nearly died when I took it; he worked over me I guess for a long time; —he said he did—because when I came to, when he got me to, it had been such a shock to him that he fainted. I took this overdose intentionally; I wanted to die. I took it for that purpose, to get out of my troubles. There was another occasion when I was tempted to commit suicide. I turned on the gas that time. I just felt as though there was nothing to live for. That was in the nighttime. I turned on the gas and I locked my door and I started to get drowsy and I started to dream. It seemed I got to dreaming about the baby and I kind of got myself to realize that I couldn't leave him and I got up then and opened the window and turned off the gas. It was the thoughts of the baby and my starting to dream about him that brought me back. It was my ill health and the treatment I received from my husband that caused me to attempt suicide. My husband knew about it. When I took the overdose of headache powder, I don't know how he found it out, but I know when I came to he was working over me and making me drink mustard water. I threatened something of this kind lots of times. Mr. Goodspeed did not take it seriously. I told him I wanted to die and I told him I would kill myself some time. One time in reply to my statement of that nature he said if I wanted to die I better go and die. He made that remark to me. That was before I tried to do it. The

turning on of the gas was not the first time. I had taken an overdose of headache medicine twice before that. I don't remember just when this gas episode was with respect to the time I separated from Mr. Goodspeed, but I know it was during the time when I was so unhappy.

"*Q*. On those occasions when you were threatening Mr. Goodspeed that you would put yourself out of the way did you make any threats against John, Jr.?

"*A*. Yes.

"*Q*. Just tell us about that?

"*A*. The first time that I—I said that if I died I would take the baby with me, I wouldn't leave the baby to him; that I knew what it was, I was brought into the world and thrown on the world without a mother, and I wouldn't leave my baby in the world without me.

"*Q*. But you never did make any attempt to take the child with you?

"*A*. No."

The defendant testified he had rather go to jail than live with plaintiff. The thing that troubles us is not, Is a cause for divorce shown? but, Is the other party so free from fault that the divorce should be granted? We will first consider the question, Has plaintiff made a case which entitles her to a decree of divorce? She charges brutality on his part in his physical relations with her. The plaintiff testified in great detail as to this alleged brutality. Defendant in the most unequivocal language denied her statements. If the charges made by the plaintiff are true it is difficult to account for her willingness as testified by her to renew her relations of sexual intercourse with defendant after her separation from him and after the property settlement. She says this occurred upon country roads when automobile riding, at her house, at a leading hotel in Grand Rapids and at two prominent hotels in Chicago. The trial judge had the advantage of seeing the witnesses. We agree with

him that the plaintiff has failed to sustain her averments of cruelty.

Has the defendant shown a cause for divorce? He produced a number of witnesses whose testimony if believed showed a degree of moral laxity utterly incompatible with the marriage relation. If any testimony was lacking in this regard it is supplied by the testimony of the plaintiff herself. Her testimony in relation to the kissing of men, to making them presents, to entertaining some of them for days at a time at her house, or in her apartments at Chicago, shows such a disregard for the proprieties and conventionalities observed by respectable people that when taken in connection with her testimony of her relations with the defendant before marriage, and after she separated from him as to establish a cause for divorce.

We come to the question of the custody of the boy. He is now more than 11 years old. He should be given into the custody of the father. The mother undoubtedly loves him and some arrangement must be made allowing her to have him with her at proper times and occasions. If counsel cannot agree upon this detail it will be decided when the decree is settled.

The decree of the court below is reversed and one will be entered here in accordance with this opinion.

OSTRANDER, C. J., and BIRD, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.