BROWN *v.* LONG MANUFACTURING CO.

1. MARRIAGE—COMMON-LAW MARRIAGE.
   Common-law marriages are recognized in Michigan.

2. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—FIND-
   INGS OF INDUSTRIAL ACCIDENT BOARD—CONCLUSIVENESS.
   The findings of fact made by the industrial accident board,
   acting within its powers, in the absence of fraud, are con-
   clusive.

3. SAME—COMMON-LAW MARRIAGE.
   The finding of the industrial accident board that plaintiff
   was not the common-law wife of decedent, *held*, justified
   by the record.

4. SAME—DEPENDENTS—ILLEGITIMATES.
   An illegitimate son of the woman with whom decedent
   was living illegally at the time of his death, begotten by
   another man, but born after plaintiff and decedent began
   living together, is not entitled to the presumption of legiti-
   macy, he not having been born in lawful wedlock, and,
   therefore, he is not a lineal descendant of decedent and is
   not entitled to compensation as a dependent under the
   workmen's compensation act.

5. SAME—DEPENDENTS—MEMBER OF FAMILY.
   Although said child had lived with his mother and decedent
   from the time of his birth until about 19 months before
   decedent's death, when he was adjudged a neglected child
   by the probate court and committed to the care of a
   charitable society, in whose care he continued up to the
   time of the hearing, it cannot be said that he was a mem-
   ber of decedent's family entitling him to compensation
   under said act.

Certiorari to Industrial Accident Board.  Submitted
January 5, 1921.  (Docket No. 31.)  Decided March
30, 1921.

Grace Brown and Eckert (Walter) Hobson, an in-

fant, by M. Hubert O'Brien, his guardian, presented their claim for compensation against the Long Manufacturing Company, Michigan Mutual Liability Insurance Company, insurer, for the accidental death of Mathew John Brown in defendant's employ. From an order disallowing the claim, plaintiff Hobson brings certiorari. Affirmed.

*Denby, Kennedy & O'Brien,* for appellant.

*Beaumont, Smith & Harris (Hal. H. Smith* and *Albert E. Meder,* of counsel), for appellees.

MOORE, J. The writ of certiorari in this case is directed to the industrial accident board to review its findings against a claim based upon the death of one Mathew John Brown. The petitioner in this case is Eckert (Walter) Hobson, a minor child, who appeared by his guardian during the progress of the original hearing before the arbitration committee. He is not the child of the decedent, but is the illegitimate child of the other applicant, Grace Brown, who claimed as decedent's common-law wife. Grace Brown does not join in this proceeding.

The return of the industrial accident board reads in part as follows:

"Findings of the Board on Hearing on Review.

"One Mathew J. Brown died as the result of an accidental, personal injury sustained by him while in the employ of the respondent Long Manufacturing Company. Respondents admit liability for the death of decedent and that death was the result of an accidental, personal injury arising out of and in the course of his employment and that the respondent insurance company carried the risk. They deny that either of said applicants were dependents within the meaning of the workmen's compensation act.

"The applicant, Grace Brown, claims to be entitled to recover as the common-law wife of the decedent, living with him as such at the time of his death. It

is claimed that the applicant, Eckert Hobson, is entitled to recover as a member of decedent's family.

"We shall first consider the question of the dependence of the applicant, Grace Brown. The applicant, Grace Brown, is a white woman, 36 years of age, whose maiden name was Grace Hancock. The decedent was a colored man. The boy named in the application as Eckert (Walter) Hobson and apparently from the records and the files in this case, at various times known as Hopp, Hobbs and Brown, it appears is an illegitimate son of Grace Brown, born September 12, 1907, as a result of the illicit relations of applicant, Grace Brown, with one Earl Hobson, who boarded in the same house with said Grace Brown at Turtle Creek, Pennsylvania. It appears from the testimony that the applicant, Grace Brown, became acquainted with the decedent in Tyrone, Pennsylvania, several months before the birth of said boy; that the two stayed at Tyrone for about four months, when the claimant, Grace Brown, at the decedent's request, went to Cleveland, Ohio. Deceased followed her to Cleveland on July 4, 1907. Claimant had been in Cleveland two or three weeks when decedent arrived. After decedent's arrival in Cleveland, they occupied the same room at the American hotel and continued to live here until after the child was born; in fact, they appear to have lived together in Cleveland for about two years when Brown came to Detroit. Claimant followed shortly after, and they continued to live together in and about Detroit most of the time until decedent met his death. It appears that the claimant, Grace Brown, was known by the name of Brown, since the decedent joined her in Cleveland, in 1907, and that they represented themselves as husband and wife, but no marriage ceremony was ever performed.

"One question at issue with reference to the dependency of this claimant is whether a valid common-law marriage existed between them. Counsel for the applicant, Grace Brown, insists that this record establishes the existence of a common-law marriage between said applicant and the decedent and quotes from *Hutchins* v. *Kimmell*, 31 Mich. at page 130, as follows:

" 'Whatever the form of ceremony, or even if all ceremony was dispensed with, if the parties agreed presently to take each other

for husband and wife, and from that time lived together professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage binding upon the parties, and which would subject them and others to legal penalties for a disregard of its obligations.'

"They also quote from *Peet* v. *Peet*, 52 Mich. 467:

" 'It is sufficient that a man and woman of due competency, and in respect to whom no impediment exists, consent to take each other as husband and wife and actually cohabit as such.'

"The question before us is: Did this man and this woman consent to take each other as husband and wife? We recognize that there are some couples who live together under a valid common-law marriage. We must also recognize that there are other couples lasciviously living together as a mere matter of convenience or for other reasons and who, as a matter of protection against criminal prosecution or unfavorable comment, represent themselves to be husband and wife and are known by the same name, although they never have consented to take each other as husband and wife. We are impressed from this record that when these parties began their cohabitation in Cleveland (and the applicant claims it first began in Cleveland), they did not consider that they had taken each other as husband and wife. In this connection the applicant testified as follows:

" '*A.* Well, I said that he suggested that we get married after we landed in Cleveland and I postponed it.

" '*Q.* You postponed it?

" '*A.* Yes, sir.

" '*Q.* He postponed it after that time again, you say?

" '*A.* No. I kept on postponing it.

" '*Q.* You always expected that some day you would be married, didn't you?

" '*A.* I had that in my head, but—

" '*Q.* But you never got to the point where you went to the preacher or the justice of the peace and got married, is that it?

" '*A.* No, sir.

" '*Q.* He told you that some day you would go to the preacher or the justice of the peace?

" '*A.* He certainly did. He certainly did love me and was good to me.

" '*Q.* He told you some day you would be married, didn't he?
" '*A.* Yes.
" '*Q.* But you never got that far, is that it?
" '*A.* No, sir.'

"In the case of *Meehan* v. *Manufacturing Co.*, 65 Ind. App. 342 (117 N. E. 265), the court says:

" 'To raise the presumption of marriage by such means, the evidence must be clear and convincing.'

"To our minds this evidence is not clear and convincing, that the parties agreed, presently, to take each other as husband and wife and did take each other as such. This testimony establishes the offer of marriage on the part of the decedent, but taken in connection with the subsequent conduct of the parties does not, in our opinion, establish a marriage. It rather indicates that the parties did not agree, presently, to take each other for husband and wife. *Judson* v. *Judson*, 147 Mich. 518.

"As we have said before, the applicant has the burden of establishing a common-law marriage. The applicant gives no satisfactory explanation of why she did not consent to the decedent's commendable desire to have a marriage ceremony performed. Taking into consideration the applicant's repeated refusal to have a marriage solemnized in the usual manner and her feeble attempt to furnish an explanation as to why she declined a marriage ceremony we are driven to the conviction that the applicant was unwilling to enter into legitimate marriage relations with the decedent. Their cohabitation being illicit in its inception, Was it subsequently by consent and agreement of the parties transformed into a valid marriage? We find in the record no convincing proof of a new or different agreement.

"In the case of the *Illinois Steel Co.* v. *Industrial Commission*, 290 Ill. 594 (125 N. E. 252), the court says:

" 'Cohabitation, illicit in its inception, will be presumed to continue so, and the party asserting a marriage has the burden of proof to show affirmatively not only that the illegal relation has terminated, but that it terminated by the parties entering into an affirmative agreement to become husband and wife.'

213—Mich.—15.

"To the same effect is the Michigan case of *Rose* v. *Rose,* 67 Mich. 619.

"To refute the rule laid down in these, which is well sustained by authority, counsel for applicant quotes from the case of *Barker* v. *Valentine,* 125 Mich. 336 (51 L. R. A. 787), as follows:

" 'There is nothing in either of these cases to indicate that if, after the impediment to a lawful marriage between them had ceased, they had intended to take each other as husband and wife, and had indicated that intention by treating each other in all respects as though they were married, and had introduced each other as husband and wife, and had so held themselves out to the world, and had lived together as husband and wife, the court would not have held· that the presumption that the illicit relations, which existed when they commenced to live with each other, continued after the impediment to their marriage ceased, was overcome.'

"In the instant case there was no impediment, according to the testimony of complainant, to their marriage previous to their illicit cohabitation, and there is no evidence which we are able to find that the character of their relations was changed. While it appears from the record, and we are compelled to rely very largely upon the testimony of the applicant, that the decedent was willing and desirous of marrying the applicant, it appears that she postponed the marriage and never assumed the obligation of marriage, is corroborated by her subsequent conduct. She admits relations with one Campbell, which are certainly consistent with the theory that she did not recognize a marriage relation between herself and the decedent. Without considering any testimony which is inadmissible, we are impressed from a consideration of the whole record that this woman's conduct was not that of a woman who regarded herself as subject to sacred marriage obligations. We are compelled to take these parties as we find them and view their intentions and good faith in the light of their conduct and deportment. On the other hand, if we are to find a common-law marriage, we must find that they, in good faith, undertook to carry out the obligations which the law imposes upon all persons who assume the marriage vows. It is not sufficient that they conform to such

portions of the marriage duties and obligations as seem to persons of their character and surroundings to be necessary for their own protection.

"The decedent being dead and unable to advise us as to his understanding and agreement as to their relations, we must judge as to whether they lived together under a valid marriage agreement, largely by their conduct. We are impressed, after careful consideration of the record, taking into consideration the statements of the applicant and the testimony as to their relations and conduct, that they were living together as a mere matter of convenience and to satisfy their own desires and that the fact of their holding themselves out as husband and wife was a mere matter of protection and that these things did not constitute a marriage.

"Having reached the conviction that Grace Brown was not the wife of decedent, we come to the question of whether she was a member of decedent's family.

"In the case of *Armstrong* v. *Industrial Commission,* 161 Wis. 530 (154 N. W. 844), the marriage of claimant to the decedent was held to be void because of a previous marriage, unknown to the claimant, whom decedent was supporting at the time of his death. In holding that claimant could not recover compensation under the provisions of a similar act because she was not a member of the family of deceased, the court says:

" 'However innocent the plaintiff may have been, in law her relation with the deceased was an illicit one, and we think it would be neither good law nor good public policy to hold that such a relation established a family relation.  *  *  *  It is not material that plaintiff may have been dependent on the deceased for her support, because she is not entitled to recover unless she was a member of his family, and cases holding that a woman living in adulterous intercourse with a man may be dependent on him for support are not in point.'

"In the Michigan case of *Medland* v. *Houle Bros.,* 202 Mich. 532, the claimant was held to be the common-law wife of decedent, thereby establishing a legal relationship between the parties. In this case, the relation must be held to have been an illicit one and therefore the applicant is not entitled to compensation.

"Coming to the question of the dependency of Eckert Hobson, his status, whatever it is, has been imposed upon him by his mother and the decedent. The decedent was not the parent of this applicant, there being no marriage relation between decedent and the boy's mother, he was not even a step-parent. The remaining question is, Was he a member of decedent's family? From the time of his birth until about nineteen months prior to the death of decedent this boy lived with his mother and the decedent and all were supported from the decedent's earnings. In October, 1917, he was adjudged a neglected child by the probate court of Wayne county and made a ward of the court. He continued to be such ward of the court until after the death of decedent, and in fact was such at the time of the arbitration. He was committed to the care of the Society of St. Vincent de Paul of Detroit and has continued in its care ever since. The order recites 'the stepfather, John Brown, to pay the said Society of St. Vincent de Paul for the care of said child.' John Brown therein referred to evidently being Mathew J. Brown, the decedent. The boy is referred to in the order as Eckert Hopp. We do not go into the question of the validity of this provision of the order or its enforceability. The probate judge evidently reached the conclusion, upon the proofs before him, that the decedent was the stepfather of this boy. The finding of the probate court in the proceeding before it is in no sense *res adjudicata* of the issues before us, even the proofs as to the names of parties must have been materially different. This order of the court whether valid or enforceable or not does not establish or continue the dependency of the boy upon the decedent. No attempt was ever made to enforce it. It was never complied with by the decedent and there is no evidence that the applicant, Grace Brown, made any effort to have it carried out. Whether this order placed a legal and enforceable obligation upon the decedent to reimburse the Society of St. Vincent de Paul for the care of the boy or not, it cannot be said to have made the boy dependent upon the decedent's earnings for support. In face of the facts which show that the order was never complied with and no attempt made to enforce it, at most, the order did no

more than to place a legal obligation upon the decedent to support the boy.

"In the case of *Roberts* v. *Whaley,* 192 Mich. 133 (L. R. A. 1918A, 189), the decedent was under legal obligations to support his minor child. He was under legal obligations to reimburse the State for the care of his wife who was an inmate of an insane asylum if he was able to do so, but it was held that they were not entitled to compensation. The wife had been committed to an insane asylum, and in disposing of her case, the court used this language:

" 'It appears without dispute that the wife was not living with her husband at the time of his death, and had not lived with him for nine years prior thereto. Therefore, it is obvious that if she is entitled to the award, it must be by reason of her dependency on him. That question is one of fact.'

"In disposing of the case of the minor child, the court says:

" 'What has been said with reference to her mother, in the main applies to Gladys. No presumption of dependency in her behalf can be indulged. In order to indulge the presumption of dependency in her behalf, it must appear that she was living with the deceased at the time of his death, and that there was no surviving parent. Neither one of these conditions was present, and therefore, she is not within the class presumptively entitled to the fund. If she is entitled to participate in the fund, it must be by reason of her having been dependent upon her father at the time of his death. The record conclusively shows that she was not dependent upon him at that time; therefore, she is not entitled to participate in the award.'

"This boy bore no relation to the decedent unless he was a member of his family within the meaning of the statute. The probate court having jurisdiction of the boy, had for cause shown taken the boy from the decedent's family, if family it could be called, and committed him to the care of the Society of St. Vincent de Paul, until the further order of the court. The boy was not, after that time, part of the decedent's family and the decedent did not contribute to his support. One of the authorities from the home testified:

" 'I know, absolutely, that the St. Vincent de Paul society cared for this boy and paid all his expenses and that no money

has been received from any other source, either from the railroad or the father, I understand.'

"Even if decedent had made some small contributions, as claimed, to the boy, in the way of clothing, that does not establish the boy's dependency, either totally or partially, because he was not a member of decedent's family, or a lineal descendant.

"After a careful consideration of all the testimony, records and files in this case, we find:

"(a) That the applicant, Grace Brown, was not the common-law wife of the decedent, Mathew J. Brown.

"(b) That the applicant, Grace Brown, is not a member of the family of the decedent, Mathew J. Brown.

"(c) That the applicant, Grace Brown, is not entitled to compensation under the statute.

"(d) That the applicant, Eckert (Walter) Hobson, was not a lineal descendant of the decedent and not a member of decedent's family.

"(e) That the applicant, Eckert (Walter) Hobson, was not dependent upon decedent for support at the time of decedent's death and is not entitled to compensation."

An important question at the outset is whether there was a common-law marriage between the woman calling herself Grace Brown and the decedent. Common-law marriages are recognized in this State. The question of what constitutes a common-law marriage has frequently been before this court. Some of the cases are: *Hutchins* v. *Kimmell*, 31 Mich. 126; *Peet* v. *Peet*, 52 Mich. 464; *Rose* v. *Rose*, 67 Mich. 619; *Van Dusan* v. *Van Dusan*, 97 Mich. 70; *Lorimer* v. *Lorimer*, 124 Mich. 631; *Barker* v. *Valentine*, 125 Mich. 336 (51 L. R. A. 787); *Judson* v. *Judson*, 147 Mich. 518; *Duff* v. *Judson*, 160 Mich. 386; *Medland* v. *Houle Bros.*, 202 Mich. 532; *Goodspeed* v. *Goodspeed*, 204 Mich. 44.

Whether a common-law marriage exists nearly always presents a question of fact. We think this is true in the instant case. It has already appeared the industrial accident board found against the existence

of the relation.   We have repeatedly held that the findings of fact made by the industrial accident board acting within its powers shall, in the absence of fraud, be conclusive.   Some of the cases are *Jendrus* v. *Detroit Steel Products Co.*, 178 Mich. 273 (L. R. A. 1916A, 381, Ann. Cas. 1915D, 476) ; *Rayner* v. *Sligh Furniture Co.*, 180 Mich. 170 (L. R. A. 1916A, 22) ; *Bayne* v. *Riverside Storage Co.*, 181 Mich. 380; *Reck* v. *Whittlesberger*, 181 Mich. 468 (Ann. Cas. 1916C, 771) ; *Hills* v. *Blair*, 182 Mich. 26; *Estate of Beckwith* v. *Spooner*, 183 Mich. 332 (Ann. Cas. 1916E, 886).

In view of the testimony of the claimant that Brown urged a marriage and that she kept putting him off, the fact that she was a white woman and Brown was a negro, and of the testimony of her illicit relations with one Campbell as late as 1917, and of the testimony of Mrs. Hebb as to what Brown told her about his relations with the woman calling herself Grace Brown, and what he had caught her doing, we do not think it can be said that the common-law marriage is established, as a matter of law, and that we should not disturb the finding of the industrial accident board.

Counsel urge that the child is entitled to a presumption of legitimacy because born in lawful wedlock, and it is said the testimony of husband and wife as to nonaccess is incompetent, citing *People* v. *Case,* 171 Mich. 282, but in that case the mother of the child had a lawful husband.   Here the finding is that the child was not born during a period of lawful wedlock, thus distinguishing the cases.   We quote from the brief:

"In a leading Michigan case it is held that the plaintiff in an action for seduction, who was married to a third party in April following the acts complained of, and gave birth to a child in September (note the similarity to the case at bar) cannot testify that she first met her husband in February of the year they were married, as the tendency of such testimony would be to rebut the presumption of legitimacy

which obtains as to children born in lawful wedlock, and which public policy requires to be preserved. *Rabeke* v. *Baer*, 115 Mich. 328."

It will be noted in the case cited that the child was born during a period of lawful wedlock, distinguishing it from the instant case.

We again quote from the brief:

"If, however, you find against a common-law marriage between Brown and petitioner's mother, the question of petitioner's membership in decedent's family under the statute is by no means foreclosed. It will be noted that the conditions precedent in the statute are in the alternative. A lineal descendant need not be a member of decedent's family, and a family member need not be a lineal descendant. In either case there must be actual dependency."

We think it must be said that upon this record it is not shown that the boy was a lineal descendant of Mr. Brown, or that when Mr. Brown received his accident the child was a member of his family. See *Roberts* v. *Whaley*, 192 Mich. 133 (L. R. A. 1918A, 189).

The case is an unfortunate one in every aspect, but it is not covered by the employer's liability act.

The order of the industrial accident board is affirmed, but without costs to either party.

STEERE, C. J., and FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.

The late Justice BROOKE took no part in this decision.