OPDYKE *v.* OPDYKE.

1. MARRIAGE—COMMON-LAW MARRIAGE VALID.
    Common-law marriages are recognized as valid in Michigan.

2. DIVORCE—COMMON-LAW MARRIAGE ESTABLISHED BY EVIDENCE.
    In a suit by a wife for divorce, property decree, and other relief, where defendant denied the existence of the mar-

[1]Marriage, 38 C. J. § 88; L. R. A. 1915E, 8; 39 A. L. R. 538; 18 R. C. L. 390; 3 R. C. L. Supp. 808; 4 R. C. L. Supp. 1184; 5 R. C. L. Supp. 981; 6 R. C. L. Supp. 1063; [2]Divorce, 19 C. J. § 353.

riage relation, claiming that he was incompetent to marry because prohibited from doing so by a decree of divorce granted to his former wife, evidence *held*, sufficient to justify the finding of the court below that there was a common-law marriage.

**3. SAME—RESTRICTION IN DECREE AGAINST REMARRIAGE DOES NOT RENDER IT VOID—STATUTES.**

In view of the fact that a marriage in violation of the restriction in a divorce decree imposed pursuant to the provisions of 3 Comp. Laws 1915, § 11434, is not therein declared to be void, but the statute only provides a penalty for its violation, the decree of the court below finding that a common-law marriage existed notwithstanding the husband was prohibited from remarrying by a decree of divorce to his former wife, refusing the wife a decree because she did not come into court with clean hands, and awarding her attorney fees and costs, is affirmed, on appeal.

Appeal from Oakland; Covert (Frank L.), J. Submitted April 16, 1926. (Docket No. 109.) Decided February 4, 1927.

Bill by Eleanor Opdyke against Robert F. Opdyke for a divorce. From the decree rendered, defendant appeals. Affirmed.

*Harold E. Howlett*, for plaintiff.

*E. L. Phillips* (*Henry G. Nicol*, of counsel), for defendant.

STEERE, J. This is a divorce proceeding. A reading of the bill of complaint would give the impression that a marriage ceremony performed by a magistrate or minister had occurred between the parties to the litigation. The prayer for relief was for a decree of divorce, for a property decree, closing with a general prayer for relief. Defendant answered the averments of the bill of complaint and denied that the

---
[2] Divorce, 19 C. J. § 455.

relationship of husband and wife ever existed between the parties, averring that he was incompetent to marry because prohibited by a decree of divorce granted to a former wife of his. The prayer of his answer was for dismissal of the plaintiff's bill. No affirmative relief was asked in the answer. Upon the hearing, testimony on the part of plaintiff tended to show a common-law marriage. She testified on that subject as follows:

"I stated in my bill of complaint that on or about the 30th day of June, 1923, I was married to the defendant in the city of Pontiac. A ceremony was not performed at that time. I fix this particular date because on that particular date he had purchased a ring and placed it on the third finger of my left hand, and put his arms around me and kissed me and said, 'We will be husband and wife from now on.' This took place at 50 Lafayette street. I remember this date particularly because my thinking it was my wedding day and the two of us dressed later on and went to Detroit and stayed at my cousin's home in Detroit, and the next day and the following night, and came back to Pontiac the following Monday morning, and announced that we had just been married. * * *

"Q. I ask you whether or not Mr. Opdyke told you he had consulted an attorney?

"A. Yes, he told me that he had.

"Q. What did he tell you this attorney had told him?

"A. He said we could agree to live together as husband and wife and it would be no one's business and it would be perfectly all right, there was nothing illegitimate about it at all.

"Q. Did he tell you some attorney told him that?

"A. Yes, sir. * * * He came over to my place right from work and he had the ring in his pocket, in a box, and took the ring out of the box and placed it on my third finger of my left hand and laid the box on the table and said, 'We will be husband and wife from now on,' and he sat down there by the table and I sat on his lap and we talked and made plans for the future for an hour or so. * * *

"*Q.* You made no reply to him when he made these statements to you?

"*A.* About the ring?

"*Q.* Yes.

"*A.* I certainly did.

"*Q.* Tell us about that.

"*A.* Why, I agreed with him, what else could I do?

"*Q.* How did you agree?

"*A.* I said, 'Yes, we will and we will go on through life and I will do all I can to make you happy,' because he always told me his life had been miserable and I told him I would do all I could to make him happy and help him save money and be a good wife to him.

"*Q.* What did he say to that?

"*A.* He acted very elated.

"*Q.* Is that all he did?

"*A.* He hugged and kissed me."

The testimony on the part of defendant tended to show a conditional future promise to marry, of which he testified as follows:

"We were planning on getting married and I had two years put on to me and I found out we could go to Toledo and get married and live out of the State for two years, it would be all right, but she says, 'No, you are liable to come back here, you got a good job here, and we will live together until your two years is up and if we think as much of each other as we do now, we will get married.'" * * *

Cross-examination.

"*Q.* During this time, Mr. Opdyke, you considered your address where?

"*A.* When I worked at the Rickenbacker?

"*Q.* Yes.

"*A.* At the Jean apartments.

"*Q.* Did you make out an employment card there?

"*A.* I didn't, no, there was a man to make that out.

"*Q.* He asks you questions and puts them down?

"*A.* They always do, yes. * * *

"*Q.* If you were hurt, who did you tell them to notify?

"*A.* I couldn't say who I told them to notify.

"*Q.* You told them to notify your wife?

"*A.* I couldn't say I did or not.

"*Q.* You wouldn't say you didn't?

"*A.* No.

"*Q.* Now, after looking this over, wouldn't you think you did tell them to notify your wife?

"*A.* I couldn't say I did or not.

"*Q.* You wouldn't say you didn't?

"*A.* No. * * *

"*Q.* Where did you give your wife's address, do you remember?

"*A.* I gave my address there at the Alartly, not the Alartly, but the Jean apartments.

"*Q.* You gave your wife's address there, too?

"*A.* I wouldn't say I did.

"*Q.* You wouldn't say you didn't?

"*A.* No.

"*Q.* If it appears on this card, it is possible you did?

"*A.* I suppose I did.

"*Q.* You also said you were married?

"*A.* If it says so here. * * * I had in mind when I told them if I was hurt, to notify my wife to the following effect. We was living there with an agreement we would live together there as man and wife, if we could get along, until my time was up for two years and we would marry and we rented an apartment under that impression that we were man and wife. I entered there under the impression we were man and wife we had to get our apartment that way."

His testimony was in substance that they lived and cohabited together from time to time but separated before the two years were up.

The trial judge found there was a common-law marriage, but was of opinion that plaintiff did not come into court with clean hands, and denied her prayer for divorce and other relief, the decree concluding, however, as follows:

"It is further ordered, adjudged and decreed, that the defendant, Robert Opdyke, shall forthwith pay to Harold E. H———— (plaintiff's attorney), the sum of one hundred fifty dollars ($150) to apply on his attorney fee for services actually rendered in said cause,

and further the taxed costs the same to be taxed and that execution may issue for the collection."

From this decree the defendant appeals to this court.

The validity of common-law marriages has long been recognized in this State. Some of the cases are *Hutchins* v. *Kimmel*, 31 Mich. 126 (18 Am. Rep. 164), where many cases are cited; *Peet* v. *Peet*, 52 Mich. 464; *People* v. *Girdler*, 65 Mich. 68; *Williams* v. *Kilburn*, 88 Mich. 279; *People* v. *Loomis*, 106 Mich. 250; *People* v. *Imes*, 110 Mich. 250; *Supreme Tent, K. O. T. M.*, v. *McAllister*, 132 Mich. 69 (102 Am. St. Rep. 382) ; *People* v. *Pizzura*, 211 Mich. 71 (10 A. L. R. 405) ; *Brown* v. *Long Manufacturing Co.*, 213 Mich. 221; and *Pillard* v. *Pillard*, 230 Mich. 575.

In addition to the testimony already quoted, the record shows that defendant several times visited plaintiff at Caro where she was running a beauty shop under the name of Mrs. Eleanor Opdyke, was introduced as her husband and stayed overnight with her where she was rooming. He also wrote to her many times addressing the envelope to Eleanor Opdyke. He also wrote to the mother of the plaintiff several times addressing her as "Dear Mother." He also paid for a license to hunt issued to Mrs. Eleanor Opdyke. There was other testimony tending to show the parties considered and represented themselves as husband and wife. While defendant insisted upon the trial that they were not married and did not intend to be, the testimony raised a question of fact and we think the trial judge was justified by a clear preponderance of the testimony in finding there was a common-law marriage unless defendant was incompetent to marry.

We are not furnished a copy of the decree in the case between defendant and a former wife, but assuming it followed the provisions of the statute granting the court authority to limit the time in which a party

to a divorce proceeding may not marry again, the statute reads:

"The court granting a decree of divorce may provide in such decree that the party against whom any divorce is granted shall not marry again within such time as shall be fixed by the court, which time shall be set out in the decree: *Provided,* That such time shall not exceed the period of two years from the time such decree is granted. And in case any person shall marry contrary to the time set out in such decree said party shall be deemed to have committed the crime of bigamy and shall be subject to the pains and penalties therefor." 3 Comp. Laws 1915, § 11434.

One phase of this statute was construed in the case of *In re Crane,* 170 Mich. 651 (40 L. R. A. [N. S.] 765, Ann. Cas. 1914A, 1173).

It will be noticed that the statute nowhere reads that if the offending party marries contrary to the limitation in the decree the marriage shall be void but it only provides a penalty in case he does so.

We find no occasion to disturb the decree entered in the court below, and it is affirmed, with costs to the appellee.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.